**MAROCEANO COMPANIA NAVIERA S. A. as Owner of S. T. PENTELI-KON, Plaintiff-Appellant,**

v.

**S. S. VERDI, her engines, etc., Italia Societa di Navigazione (Italian Line), Defendant-Appellee.**

**S. S. VERDI, her engines, etc., Italia Societa di Navigazione (Italian Line), Plaintiff-Appellant,**

v.

**MAROCEANO COMPANIA NAVIERA S. A. as Owner of S. T. Pentelikon, Defendant-Appellee.**

**Nos. 396, 397, Dockets 35106, 35202.**

United States Court of Appeals, Second Circuit.

Argued Jan. 7, 1971.

Decided Feb. 8, 1971.

Nicholas J. Healy, New York City (Healy & Baillie, Allan A. Baillie and John C. Koster, New York City, of counsel), for Maroceano Compania Naviera S.A. as Owner of S. T. Pentelikon.

Eugene Underwood, New York City (Burlingham, Underwood, Wright, White & Lord, Kenneth H. Volk and Frank L. Wiswall, Jr., New York City, of counsel), for Italian Line and the S. S. Verdi, her engines, etc.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

These consolidated actions arise out of a collision in the early morning of April 16, 1964 between the "Pentelikon," a single screw steam turbine driven oil tanker owned by Maroceano Compania Naviera S.A., and the "Verdi," a twin screw passenger and freight vessel owned by Italia Societa di Navigazione. The parties will be designated by the names of the vessels owned by them, respectively. The trial court found both vessels equally at fault and held that damages and costs be divided equally. The Verdi was awarded interest at 6% from May 8, 1970. From this judgment the Pentelikon appeals, claiming that the Verdi was solely at fault. The Verdi seeks to modify the judgment by claiming pre-judgment interest. The pre-trial order narrowed the issues in that the Verdi admitted fault but asserted that the Pentelikon was also at fault.

On the night (April 15–16, 1964) the Pentelikon was proceeding in an easterly direction (course 090) through the Strait of Gibraltar towards the Mediterranean Sea, her speed over the ground was approximately 13 knots. The Verdi was headed for the Atlantic Ocean in a southwesterly direction (course 242) at a speed through the water of some 17 knots. The weather was clear and the visibility good. The Pentelikon sighted the Verdi at 0135 hours. As the Trial Court found, "The courses of the two vessels were such that there was a crossing situation with the Pentelikon the privileged vessel." The Pentelikon "after having sighted the Verdi, maintained her course of 090 up until the time she was *in extremis* as was required of her by the International Rules of the Road, Rule 21.", namely, where "one of two vessels [here the burdened vessel Verdi] is to keep out of the way, the other [Pentelikon] shall keep her course and speed." Thus the Pentelikon properly

conformed to the navigational rule she was required to follow.

While the Pentelikon was thus proceeding, the master of the Verdi "became concerned with the Pentelikon and the risk of collision." "Since the Verdi was the burdened vessel under the Crossing Rule (Rule 19), she should have taken early action to avoid the Pentelikon, slackened her speed, stopped, or reversed, or taken other action to avoid the collision or crossing ahead of the Pentelikon. She did none of these things." [1]

As the vessels approached each other, the Pentelikon flashed a "U" signal, meaning, "You are standing into danger."[2] No action having been taken by the Verdi, a second "U" signal was flashed and the danger warning was sounded on the Pentelikon's whistle. The vessels were then *in extremis* and the Pentelikon took affirmative action to avoid a collision by turning to starboard and by ringing down full speed astern.

Even then "this collision might have been avoided had the Verdi taken the action required of her,". However, she did not. Instead she compounded her faulty navigation. As the Trial Court found, "The Verdi was also at fault for turning to port in her last maneuver and thus tending to cross ahead of the Pentelikon instead of turning to starboard, which would have tended to have her pass astern of the Pentelikon."

In the face of such overwhelming proof that the Verdi's actions were the cause of the collision, upon what grounds did the Trial Court rest its conclusion of equal liability? The Trial Court held that when the *in extremis* point was reached, the Pentelikon was obliged "to take some affirmative action toward avoidance of the collision." But if this were her duty, she satisfied it by veering off to starboard and reversing her engines, whereas the Verdi, which could have avoided a collision, took affirmative action by turning in the wrong direction, thus colliding with the Pentelikon. The Trial Court found that the Pentelikon should have taken action after she had blown the danger signal but she had every right to expect that the Verdi would heed the danger signal and maneuver properly. Nothing that the Pentelikon could have done could have avoided the collision in the light of the Verdi's unexpected turn to port. The Trial Court speaks of the Pentelikon's failure "to justify her conduct of inaction" but, first, there was no inaction and, second, the burden of justification was not on the privileged vessel.

The Trial Court also found the Pentelikon at fault for not using its radar. Radar is a useful electronic device for detecting the presence, and plotting the course, of other vessels, particularly in a fog or in weather reducing visibility but on a clear night with high visibility it would not have been superior to, or even effective as, the human eye. The master of the Pentelikon had the Verdi under observation and in plain sight for some time. Radar could not have given him the position of the Verdi more accurately (if as accurately) as he from his position on the bridge could determine it. In fact had he left the bridge to observe through a radar what he had been observing over the last many minutes before the collision, he might well have been charged with negligence. There was no causal connection whatsoever between the failure to observe the Verdi through a radar screen rather than by visual sighting and the collision. See White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419 (4th Cir. 1960).

The Trial Court in proper recognition of the role which hindsight plays in these collision cases said that it was unfortunate that "the masters of these two vessels did not have their able counsels' assistance available to them on the night of April 16, 1964." Equally unfortunate was the lack of a library of

---

1. Quotations from Trial Court's findings in opinion.

2. International Code of Signals, H.O. 103.

this Circuit's decisions available on the bridge because counsel for the Verdi could have read to the master from this Court's decisions in Hellenic Lines v. The Exmouth, 253 F.2d 473 (2d Cir. 1958), cert denied sub nom. American Export Lines Inc. v. Hellenic, 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074 (1958) and Northern Petroleum Tank S.S. Co. v. City of New York, 282 F.2d 120 (2d Cir. 1960). By coincidence, the factual situations in both cases were almost identical to the present case. In both cases the trial court held each vessel to have been at fault and in each case this court reversed the finding of equal liability.

In *Northern Petroleum* this court said as to the "Tynefield" [corresponding to the "Pentelikon" here]:

"* * * The entire purpose of any navigational rule is to create as much certainty as possible so that each vessel can conduct itself accordingly. The Tynefield had a right (even a duty as well) to maintain its course until collision appeared likely. The Dongan Hills was under an obligation to avoid a collision by obeying the rule and the Tynefield had a right to expect that she would do so. * * *

"In view of this long recognized navigational rule and the importance of strict adherence thereto, the trial court's conclusions that 'Regardless of the right and privilege of the Tynefield to maintain her course and speed there was a continuing duty on her part to exercise care to avoid collision until the crossing was safely effected'; that the Tynefield 'failed to change her speed and course until too late'; and 'took no precaution to avoid the impending collision until it was too late, relying recklessly on its "privilege" in this crossing situation' are not in accord with the law. It was not reckless for the Tynefield to rely on its privilege. To the contrary she was obliged under the Rule to maintain her course (The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771). She cannot be charged with any failure to change her speed and course when to have done so would have violated the Rule. Nor did she have any reason to believe that the Dongan Hills would not comply with the Rule. It was the Dongan Hills' duty to change her course and speed (if necessary) to avoid collision. * * *."

In the *Hellenic Lines* case, the Hellenic (Pentelikon) and the Exmouth (Verdi) sighted each other at some distance on a clear night. The Hellenic was the privileged vessel and held her course to almost the last minute as here. She gave proper whistle signals and finally the danger alarm, then turned hard right and reversed—all as did the Pentelikon. There too, was involved a reversal of the trial court's finding of equal liability and a holding by this court of sole liability on the part of the Exmouth.

The Trial Court's conclusion of the Pentelikon's fault *in extremis* is also inconsistent with this Court's decision in The Stifinder, 275 F. 271 (2d Cir. 1921), where the Court said:

"The Stifinder's duty was to keep her course and speed in the expectation that the Selje would obey the law and keep out of the way. When it became apparent that the steamer did not intend to conform to the law, the vessels were then in extremis, and what was done or omitted to be done by The Stifinder in the agony of collision can make no difference, as it is impossible to consider a decision so made as a fault. * * *"

If, as the Trial Court here indicated, the Verdi's action in turning to port instead of to starboard (the actual cause of the collision) "may be excusable in view of the fact that the vessels at that time were *in extremis*" so much the more were the Pentelikon's actions when this point was reached.

Upon the law and the facts, the court concludes that the Verdi was solely at fault. The decree appealed from is reversed with costs with the question of damages and the proceedings for the ascertainment thereof to be decided by the Trial Court. The appeal as to pre-judgment interest is dismissed.