530 F.2d 7
 In the Matter of the Complaint of Farrell Lines Inc., Owner
of the Steamship
African Neptune, for Exoneration from or Limitation of
Liability. FARRELL LINES INC., Owner of the STEAMSHIP
AFRICAN NEPTUNE, for Exoneration from or Limitation of
Liability, Plaintiff-Appellant Cross-Appellee,
v.
Owens JONES et al., Claimants-Appellees,
Willie Belle Thomas et al., Claimants-Appellees Cross-Appellants.
 No. 74--3940.
 United States Court of Appeals,
Fifth Circuit.
 April 15, 1976.
Rehearing and Rehearing En Banc
Denied May 20, 1976.
 
 Julian C. Sipple, Gustave R. Dubus, III, Savannah, Ga., Richard H. Brown, Jr., New York City, for Farrell Lines.
 Leon A. Wilson, II, Benjamin Smith, Jr., Waycross, Ga., for Owens Jones et al.
 J. S. Hutto & Associates, Brunswick, Ga., for Willie Belle Thomas.
 Courtney W. Stanton, Jacksonville, Fla., Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for State of Ga.
 J. Richard Moore, Jacksonville, Fla., for L. H. Rooks.
 Richard E. Deane, Jacksonville, Fla., for R. McNeal, et al.
 David B. Kaplan, Boston, Mass., A. Blenn Taylor, Brunswick, Ga., for Thomas, et al.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before DYER and CLARK, Circuit Judges, and KRAFT*, District Judge.
 DYER, Circuit Judge:
 
 
 1
 Farrell Lines, Inc., owner of the Steamship AFRICAN NEPTUNE, appeals the judgment of the district court denying its petition for limitation of liability. We reverse.
 
 
 2
 On November 7, 1972, at 9:36 P.M., the AFRICAN NEPTUNE, left its berth at Brunswick, Georgia and proceeded down the East River on its way out of the harbor. The AFRICAN NEPTUNE was required to proceed down the river, turn 50 degrees to port to the Turtle River Lower Range course of 113 degrees true and thereafter pass through the 250 foot wide open draw of the Sidney Lanier Bridge on about 113 degrees true.
 
 
 3
 Two pilots directed the AFRICAN NEPTUNE's transit out of the port. At all times material, both pilots were on the bridge along with the master of the vessel, a watch officer and a helmsman. As the AFRICAN NEPTUNE approached the bridge, the pilot ordered the helmsman to put the rudder left 20 degrees. The helmsman repeated the order correctly when he received it, but executed the order incorrectly by putting the rudder 20 degrees right instead of left.
 
 
 4
 This error was tragic. A short time later, the watch officer detected the mistake and tried to indicate to the helmsman that the wheel should be put left. Both pilots also became aware of the mistake, as did the master. One of the pilots instinctively ordered hard left rudder followed by full astern. Other emergency measures were taken, but to no avail. At approximately 9:49 P.M., the AFRICAN NEPTUNE struck the bridge. Ten people were killed and ten others were injured.
 
 
 5
 Farrell filed a petition for exoneration from or limitation of liability. Farrell thereafter conceded that it was not entitled to exoneration. The district court was thus concerned solely with the issue of limitation. At the conclusion of trial, the district court ruled from the bench that Farrell was not entitled to limitation. It later made findings of fact and conclusions of law, 378 F.Supp. 1354. It is those findings and conclusions which Farrell complains of here.
 
 
 6
 Under 46 U.S.C.A. § 183, the liability of a shipowner for any loss, damage, or injury by collision may not exceed the amount or value of the interest of the owner in the vessel, if 'done, occasioned or incurred' without the privity or knowledge of the owner. Subsection (e) provides that with respect to loss of life or bodily injury, the privity or knowledge of the master of the vessel at or prior to the commencement of each voyage is deemed conclusively the privity or knowledge of the owner.
 
 
 7
 The district court found that the procedures mandated by the shipowner and the procedures utilized by those in command of the AFRICAN NEPTUNE on the night of the collision were inadequate and did not include 'failsafe' precautions. The specific shortcomings in these procedures found by the district court were: (1) insufficient personnel on the bridge to insure proper helmsmanship; (2) delegation to the watch officer of the duty to keep the bell log book in addition to his duty to oversee execution of the pilot's orders to the helmsman; and (3) improper positioning of the rudder angle indicator on the pilot house bulkhead on the bridge which did not conveniently permit prompt detection of the helmsman's error.
 
 
 8
 Based on these findings, the district court concluded that Farrell had 'failed to sustain its burden of proving that navigational errors which caused the collision were without its privity or knowledge.' We reject this conclusion of the district court as being inconsistent with the standards required of a shipowner in order to avail himself of the benefits of the Limitation Act.
 
 
 9
 The determination of whether a shipowner is entitled to limitation employs a two-step process. First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. Knowledge or privity of any fact or act causing the accident is not enough for denial of limitation; it is only knowledge or privity of negligent acts or unseaworthy conditions which trigger a denial of limitation. Coleman v. Jahncke Service, Inc., 5 Cir. 1965, 341 F.2d 956; Avera v. Florida Towing Corp., 5 Cir. 1963, 322 F.2d 155.[1] And, although the petitioner in limitation bears the burden of proving lack of privity or knowledge, the initial burden of proving negligence or unseaworthiness rests with the libellants. Coleman v. Jahncke Service, Inc., supra.
 
 
 10
 In this case, all agree that the predominating cause of the accident was the navigational error of the helmsman in improperly executing his orders. There is also agreement that this navigational error was without privity or knowledge of Farrell. Thus, claimants have attempted to establish acts or conditions other than this navigational error which contributed to the accident and of which Farrell had knowledge. Specifically, the claimants argued below that Farrell utilized procedures, personnel, and equipment which were inadequate to prevent the human navigational error which directly caused the accident.
 
 
 11
 As outlined above, we are not concerned solely with the question of whether Farrell had knowledge of the allegedly inadequate procedures, personnel and equipment. Rather, we must first consider whether the procedures, personnel or equipment utilized involved negligence or rendered the AFRICAN NEPTUNE unseaworthy.[2] Of course, we should not overturn the findings of the district court unless we conclude that they are clearly erroneous. Nuccio v. Royal Indemnity Co., 5 Cir. 1969, 415 F.2d 228; Empire Seafoods, Inc. v. Anderson, 5 Cir. 1968, 398 F.2d 204. But, by the same token we should not hesitate to overturn those findings if we are left with the definite and firm conviction that a mistake has been committed by the district court. Wade v. Mississippi Cooperative Extension Service, 5 Cir. 1976, 528 F.2d 508. With these standards in mind, we consider seriatim the grounds relied on by the district court.
 
 PROCEDURES AND PERSONNEL
 
 12
 When the AFRICAN NEPTUNE left its berth there were five persons on the bridge: the master, the watch officer, the helmsman, and two pilots. According to Farrell's 'Manual for Ship's Officers,' the watch officer 'must observe the steering, and see that all steering and engine orders are promptly and carefully carried out.' He or she must 'observe the steering closely' and is responsible for 'seeing to it that the course set and steered is made good.'
 
 
 13
 When a pilot is employed, the Manual provides that the Master 'shall see that the officer of the deck renders the pilot all necessary assistance in the navigation of the ship and that there is no relaxation of vigilance on the part of the officer of the deck or lookouts.'
 
 
 14
 In addition, the Manual contains repeated assertions that safety is the paramount concern of each ship's officer. Hence, there was no failure on Farrell's part in recognizing the importance of the watch officer's role of observing the execution of steering orders, and Farrell very clearly stressed the safety principle pervasively throughout the Manual.
 
 
 15
 Therefore, the only question is whether Farrell's Manual or the Master should have provided that additional persons be on the bridge during the transit of restricted waters such as existed at Brunswick. More specifically, we must ask whether the absence of such additional persons was negligent or rendered the vessel unseaworthy.
 
 
 16
 The only testimony in the record which suggests that there should have been extra persons on the bridge was that of Captain Kennedy, a former commander in the United States Navy, called as an expert witness by claimants.[3] He testified that in the Navy it was customary to place an extra person on the bridge to oversee the helmsman's execution of orders when a vessel was operating in confined or restricted waters. But Captain Kennedy also testified that two pilots, a master, a watch officer and a helmsman on the bridge was a sufficient complement if one of them was continually monitoring the helm and engine order telegraph.[4] Thus, even Captain Kennedy, the claimant's expert, testified that the bridge complement utilized by Farrell was reasonable and prudent, if one person out of that complement was 'continually available' to monitor the helm.
 
 
 17
 The testimony established that the watch officer had the duty to keep the bell log book as well as to oversee execution of the pilot's orders to the helmsman. The evidence establishes without contradiction, however, that, in spite of this dual responsibility, the watch officer was nevertheless 'continually available' to monitor the helm.
 
 
 18
 Captain Kennedy testified that it was common sense for a watch officer to verify a rudder angle rather than make a bell book entry; that it takes only a couple of seconds to make such an entry; and that the specific bell book entries made on the AFRICAN NEPTUNE shortly before the accident should not have significantly affected the watch officer's duty to verify the accuracy of the helmsman's actions. This latter testimony establishes that, at the time of the accident,[5] the watch officer was, or under the procedures mandated by Farrell should have been, continually available to monitor the helm.
 
 
 19
 Two other expert witnesses testified on behalf of claimants. One testified that a watch officer could check a helmsman for error even at night simply by turning his head which takes only a second; that maintaining a bell book does not interfere with checking the helmsman; and that it is more important to check the helmsman than to make bell book entries. The other expert testified that it was his standard practice as well as that in the merchant marine to have the watch officer handle the engine telegraph, keep the bell book and make sure that the helmsman carried out orders correctly.
 
 
 20
 In light of this evidence, we can only conclude that the watch officer was continually available to monitor the helm, notwithstanding his dual responsibility. Thus, in light of this determination, all testimony, even that of Captain Kennedy, supports the conclusion that the bridge complement, and the assignment of duties to those on the bridge, was reasonably safe under the circumstances. The finding of the district court that the AFRICAN NEPTUNE was unseaworthy, or Farrell negligent on those bases is therefore clearly erroneous.
 
 EQUIPMENT
 
 21
 Claimants argue, and the district court agreed, that the rudder angle indicator was positioned so as to hinder prompt detection of the helmsman's error. They argue, and the district court agreed, that this rendered the vessel unseaworthy at the time of the accident.
 
 
 22
 The rudder angle indicator is a lighted dial which indicates the actual angle of the rudder to port or starboard. It was located high up on the forward bulkhead just to the left of the centerline of the wheelhouse. It is directly in front of the helmsman and is immediately visible to the watch officer. Both pilots testified that they had to step back a few paces to see it, but that they knew where it was located. There was also testimony that the indicator does not instantly reflect a change in the angle; there is a time lag between a rudder shift and the reaction of the indicator. Thus, those responsible on the bridge had ample time and opportunity to check had ample time and opportunity to check the rudder angle indicator if they so desired. Their failure to do so was not caused by the position of the rudder angle indicator, but rather by their own inattention or inadvertence, acts not within the knowledge or privity of Farrell. On these facts, the positioning of the indicator was not a proper basis for a finding of unseaworthiness. The district court clearly erred in finding otherwise.
 
 
 23
 In sum, neither the absence of an additional watch officer nor the location of the rudder angle indicator involved negligence or rendered the vessel unseaworthy. Although the presence of an additional officer or the relocation of the indicator might have reduced the possibility of collision,[6] that is not the standard by which we are to determine whether Farrell is entitled to limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel reasonably fit under the circumstances. Here, we conclude, as in United States v. Sandra & Dennis Fishing Corp., 1 Cir. 1967, 372 F.2d 189, that the vessel as equipped was reasonably capable of performing the intended mission if properly operated. The accident resulted from lack of care and failure to exercise proper procedures by those on the bridge. For this Farrell is liable, but it is also entitled to limit.
 
 
 24
 REVERSED.
 
 
 25
 CLARK, Circuit Judge (dissenting).
 
 
 26
 Despite my great respect for the experience and expertise in this field of law of the majority and the deference which I do and should accord to their judgment, I hear a different drummer. I cannot bring myself to that critical point necessary to reverse the equally learned district judge--a definite and firm conviction that as trier of fact he made a mistake.
 
 
 27
 This was not a routine harbor departure, nor was it an ordinary passage through confined or restricted waters. One single maneuver which those in charge of the AFRICAN NEPTUNE planned for her to make on her course to the sea was so critical that a six-second error in its execution irrevocably consigned ten human beings to their death and injured ten others. Indeed, the majority does not contest the correctness of the district judge's determination that a high degree of care was demanded in the ship's approach to and clearance of the bridge and that it was not a routine operation.
 
 
 28
 Additionally, on this disastrous evening almost every possible adverse factor was aligned against a safe transit of the bridge opening by the AFRICAN NEPTUNE and every one of them was known. Before she left the dock the master knew, and therefore Farrell knew, these things: the ship was in a light condition, which meant much more of her freeboard and her rudder was above the water line. Her propeller was barely under the surface. There was a westerly wind of some 10 to 15 knots. A full tide had begun to ebb. A fairly strong current in the river was flowing seaward. Thus, maneuverability at the crucial point was hampered in every conceivable fashion, so much so in fact that one expert testified he would not have put to sea under those conditions. The district judge determined in an unchallenged finding that the helmsman's error was detected by the third mate about six seconds after it occurred. Although correction was instantly begun, the ship was already irrevocably committed to its peril.
 
 
 29
 In reversing, the majority focuses upon two general faults--whether Farrell should have required additional persons to man the bridge during departures or whether the rudder angle indicator should have been differently positioned. Though I agreed with the majority's conclusions that neither of these findings formed a proper factual basis for denying limitation, I would come out differently. While the district judge listed them among the shortcomings, I do not feel that they formed the real basis for his determination that the ship and its master failed to specifically prepare for the delicate risks they were about to undertake on this departure.
 
 
 30
 The evidence is uncontradicted that on this fateful evening no safety procedures were discussed with either of the pilots aboard or with the bridge crew. No thought was taken for the safe navigation through the bridge span 'because we didn't anticipate any danger.'
 
 
 31
 The crucial finding of the district judge was that prior to the vessel's departure from the dock the master failed to coordinate procedures and understandings with all concerned with respect to approach to the bridge and its transit--a fault which contributed to the collision. It cannot be gainsaid that the accident happened because the helmsman erred. However, neither the errant helmsman nor the third mate assigned the duty of watching him were ever told that this particular turn, which the master and pilots know would have to be made to enter the bridge span, was so highly critical and dangerous that an error in its prompt, correct execution carried the portent of death and destruction and that mere seconds in its detection and correction would render its consequences inevitable.
 
 
 32
 Although the district judge may have chosen too harsh a term which he described the procedures that night as lacking in 'fail safe' precautions, I cannot fault his ultimate determination that before the AFRICAN NEPTUNE got underway Farrell or its master should have taken a moment to tell those about to be charged with this ultrahazardous undertaking what to expect and how they could minimize or prevent hazard to life and limb in the maneuver that lay ahead.
 
 
 
 *
 Senior District Judge of the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 As stated in Avera v. Florida Towing Corp., supra, at 158:
 For the problem always exists, and certainly does here, of determining just what specific acts of negligence were committed against which the admiralty court subsequently applies the privity-knowledge yardstick.
 See also 3 Benedict on Admiralty, § 41, p. 5--5:
 Without negligence there can be no privity or knowledge for there is nothing then to which the shipowner, however familiar with facts that establish his innocence, can be said to be privity (sic).
 
 
 [2]
 In making this analysis, we note that the determination of negligence overlaps the determination of unseaworthiness. Seaworthiness is defined as reasonable fitness to perform or do the work at hand. Walker v. Harris, 5 Cir. 1964, 335 F.2d 185. The standard of reasonableness thus pervades both determinations
 
 
 [3]
 All other experts for claimants and Farrell testified that the AFRICAN NEPTUNE's bridge complement was adequate, safe, and standard in the merchant marine
 
 
 [4]
 The following colloquy took place during cross-examination of Captain Kennedy:
 Q: (F)or a merchant ship, in going out of a harbor with a complement on the bridge of a docking pilot, river pilot, Captain, a watch officer, and a man at the wheel, do you consider that unreasonable or imprudent to go out with that complement on the bridge?
 A: If one of them were continually monitoring the helm and your engine order telegraph, I would say that would be sufficient complement.
 Q: Well, suppose one of them were available to continually do that, would that be sufficient?
 A: Well, I tried to answer your question, sir, if one of those persons were continually available to monitor the helm and the telegraph operator, I would say yes, it was sufficient complement, to see that the helm did not go in the opposite direction from which it was ordered.
 Q: . . . So actually, in addition to the navigating pilot, there were three people who could have picked up the helmsman's mistake, is that correct?
 A: Right.
 
 
 [5]
 We do not question whether the duties might have interfered with each other at other times. Bound by the requirement of causation, we only consider negligent or unseaworthy conditions which existed at the time of the accident and contributed to that accident
 
 
 [6]
 As stated by Captain Kennedy:
 'No system is infallible, sir, if people are running it, there's no infallible system. All you can hope for is to get one that is less infallible than another.'
 But just because one system is less perfect than another does not mean that the use of the former is negligent or renders the vessel unseaworthy.