**In the Matter of the STATE OF LOUISI- ANA, the DEPARTMENT OF HIGH- WAYS, as owner of the FERRY GEORGE PRINCE, praying for exoner- ation from or limitation of liability.**

Civ. A. No. 74–2123.

United States District Court, E. D. Louisiana.

July 26, 1978.

Fred E. Salley, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Nigel E. Rafferty, Monroe & Lemann, New Orleans, La., for defendant.

Thomas J. Kliebert, Becnel & Kliebert, Gramercy, La., Harris M. Dulitz, Ungar, Dulitz, Jacobs & Manuel, New Orleans, La., Douglas H. Greenburg, Houma, La., Joe L. Horne, New Orleans, La., for plaintiff.

JACK M. GORDON, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This consolidated civil action arises out of a collision which occurred on February 4, 1974, on the Mississippi River between Luling and Destrehan, when the lead barge in the tow of the M/V F. R. BIGELOW struck the starboard bow of the ferry GEORGE PRINCE.

The ferry was owned and operated by the Louisiana State Department of Highways. The BIGELOW was owned and operated by the Ingram Barge Company, which was a division of the Ingram Corporation. The barges in tow of the BIGELOW were under a bareboat charter to the John F. Beasley Construction Company. Dixie Auto Insurance Company issued an Owners', Landlords' and Tenants' Liability Policy to Highways which covered the GEORGE PRINCE, with the Insurance Company of North America as the hull insurer of the ferry.

On July 31, 1974, Highways filed a limitation of liability proceeding pursuant to 46 U.S.C. 183, et seq., alternatively seeking exoneration from liability. Various passengers on the ferry filed claims in the limitation proceeding, seeking personal injury and property damages. Ingram filed a claim for its damages; Beasley Construction filed a claim for the damage to the barge which struck the ferry. Highways cross-claimed against Ingram for the damage to the ferry.

In separate actions, the various passengers sued either Ingram, Dixie, or both for their damages; Beasley Construction sued Ingram for the barge damage; and INA and Highways sued Ingram for the ferry damage. These separate actions were consolidated for trial by a memorandum order and opinion dated April 17, 1975.[1]

Trial of the case was held from October 17 through 21, 1977, with the issue of liability severed from that of damages. Counsel were afforded the opportunity to present further briefing on the case, which was completed on December 21, 1977, at which time the Court took the matter under submission. Based on the evidence adduced at trial, and the law applicable to the case, the Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.

The GEORGE PRINCE was a river ferryboat for passengers and vehicles, Official No. 236825, weighing 259.11 gross tons, 120.3 feet in length, 34.4 feet in breadth and 7 feet in depth. On February 4, 1974, it was owned and operated by the State of Louisiana, Department of Highways. The ferry was pilothouse controlled, with twin screws and two rudders, and 670 horsepower. It was outfitted with a Raytheon 2900 radar, and a VHF radio equipped to operate on Channel 13, the bridge-to-bridge chan-

---

1. The April 17, 1975, opinion also decided that Dixie Auto Insurance Company could be sued directly, under the Louisiana Direct Action Statute, for this purely admiralty cause of action. Therefore, to the extent that Dixie continued to raise the point as an issue at the trial on liability, it is moot, having been disposed of in the memorandum opinion and order, for the reasons stated therein.

nel. All equipment on the ferry was in good working condition the morning of the collision.

## 2.

The BIGELOW was a 6600 horsepower river pushboat, with twin screws, two steering rudders and four sets of flanking rudders. The pilothouse was equipped with two Decca radar sets, two separate VHF radio transmitters and receivers, an intercom system and a general alarm system. At all material times, the BIGELOW was owned and operated by Ingram Barge Company, a division of Ingram Corporation, and engaged in the petroleum and rock hauling trade on the Mississippi Inland Waterway Systems. All equipment on the BIGELOW was in good working condition on February 4, 1974.

## 3.

The GEORGE PRINCE operated as a passenger and vehicular ferry at Mile 120.7 AHP of the Lower Mississippi River, between Luling and Destrehan, Louisiana, making regular crossings of the river at a rate of approximately one crossing every 20 minutes. The Luling/Destrehan ferry operates on a 24-hour-a-day basis, with three eight-hour shifts.

## 4.

On February 4, 1974, the pilot of the GEORGE PRINCE for the 12:00 to 8:00 A.M. shift was Captain Earl Louis Nelson. Captain Nelson was a licensed river pilot, holding a U.S. Coast Guard License as a First Class Pilot of Steam and Motor Ferries of Less Than 300 Gross Tons on the LMR at Mile 120.7 AHP, between the east and west banks on an established ferry route. He had been operating the GEORGE PRINCE on this route since December, 1973.

## 5.

On the morning of the collision it was dark, about two hours before sunrise, with an air temperature of about 45 ° Fahrenheit, and light, variable winds. However, visibility was good, with estimates of from two to three miles. The river current near the ferry crossing was strongest at midstream, about 8 to 12 miles per hour.

## 6.

As a regular procedure, the ferry crosses the river so as to land on either side with the bow of the ferry facing upstream. This means the ferry docks at Luling with the port side near the landing, and at Destrehan with the starboard side near the landing. The Destrehan landing is slightly downriver of the Luling dock.

## 7.

In order to cross the river from the west bank (Luling) to the east bank (Destrehan), the ferry moves up into the river and away from the landing, then into a crossing pattern. As the ferry approaches midstream, the current forces the bow to starboard, facing slightly downstream. The ferry drifts downstream with the current briefly before nosing back upstream and across to make a starboard landing at Destrehan. The entire procedure resembles a backwards "S" curve across the river.

## 8.

At about 5:40 A.M. the GEORGE PRINCE had finished boarding passengers and vehicles at Luling for the trip to Destrehan. As usual, the ferry was moored port side to dock, heading upriver. Twenty-nine vehicles and thirty-eight passengers were taken board, the vehicles covering the entire deck of the ferry.

Nelson sounded one whistle blast to indicate the completion of loading, and to signal to the ferry's two deckhands to raise the loading ramp, secure the chains across the ramp, and cast off the moorings. The deckhands did this, and then went inside the vessel's house where they remained until after the collision. Captain Nelson was alone in the pilothouse during the crossing, the only other crew member being the engineer, who was in the engineroom at the time of the collision. There was no lookout posted because visibility was clear.

**9.**

Before leaving the landing, Nelson made both visual and radar checks of the river. On his radar, Nelson observed two anchored ships which were upstream from his intended route. He could visually see the lights on the ferry landing across the river, as well as the white and red lights downstream, where the Destrehan and Bunge grain elevators and loading docks are located on the east bank of the river. He did not see a tug pushing a tow ahead near the Bunge grain elevator, either visually, or on radar.

**10.**

After unmooring was completed, the ferry maneuvered to starboard and out into the river with both engines operating at full speed ahead. Captain Nelson did not use his radio to make a traffic check prior to leaving the west bank, although the radio was set on Channel 13. After departing the west bank, Nelson did not hear any communications over the marine radio; however, he did hear some radio traffic over his police radio.

**11.**

Some of the passengers observed the running lights of a tow on the east bank of the river before they drove aboard the ferry. Others, who were parked on the starboard side of the ferry, noticed these lights either while the ferry was still moored on the west bank or shortly after it departed. The lights were described by the passengers as a blinking amber light, a red light located downstream from the amber light, and a combination of lights which were recognizable to some as being those of a towing vessel. During the trip across the river, some passengers continuously observed these lights, which they recognized as being those of an upbound tow, and were aware that the ferry was in a crossing situation with that tow. Some of the passengers who were watching the tow believed that the ferry would take measures to stay out of the way of the tug and tow.

**12.**

The BIGELOW, meanwhile, was upbound on the Mississippi River during the early morning hours of February 4, 1974. Wash J. Currington was at the helm from midnight until the time of the collision. Captain Currington was licensed by the U.S. Coast Guard as an Operator of Uninspected Towing Vessels upon the Inland Waters of the U.S. and Western Rivers. He had a mate and two deckhands on watch with him, although he was alone in the pilothouse when the collision occurred, and no lookout was posted, either on the tug or on the tow.

**13.**

The BIGELOW was in the process of collecting barges for her upriver voyage. At Mile 101, the BIGELOW added Barge 108. At Alter Fleet (Mile 115 AHP), Barge BL-101 was added. The BIGELOW then proceeded, with temporary soft rigging on all barges, upriver to Norco, where more barges were to be added, and where the tow was to be rearranged permanently with hard rigging for a voyage to Paducah.

**14.**

As the BIGELOW approached the Bunge Grain Elevator on the east bank of the Mississippi River, it was favoring the east bank of the river and pushing a tow ahead of nine barges, made up in a notched configuration, approximately 684 feet long. Across the front of the tow were the Barge U-727 to starboard, the Barge U-707 in the center, and, notched back one barge length, the Barge BL 101 to port.[2]

**15.**

A properly shielded green running light was placed on the starboard bow of the U-727. A flashing amber light was placed

2. See, exhibit, Ingram No. 10 for a drawing with the complete configuration of the BIGELOW tow on the morning of the collision.

on the bow of the U–707 at the center of the entire tow. This amber light was screened with metal wing-like fittings to show through an arc of about 10 points of the compass, when the Western River Rules call for a 20-point light. A red running light, not screened at all, was affixed to the port bow of the BL–101 just forward of the timberhead, so that the bow bits could act as a sort of natural screen for the red light. All three lights were temporary, battery-powered lights, to be used until all barges were picked up and a final, hard-rigging, tow configuration was obtained.

## 16.

The tow of the BIGELOW was an average-sized tow for the Mississippi, where tows of 25–30 barges are not unusual. The testimony of Captain Joseph Conkwright and Captain William Russell Blake, as well as that of the passengers on the ferry, compels a finding that all lights on the tow were burning brightly and could be seen from a distance of at least two miles. From the starboard, a passing vessel could see only the green and flashing amber light. From port, only the red and amber lights were seen. From dead ahead, all three lights were visible, with the positioning of the red light indicating a notched tow to the port side.

## 17.

As the BIGELOW was passing the Bunge Grain Elevator, Captain Currington saw the GEORGE PRINCE leave the Luling Ferry Landing. As the ferry proceeded east across the river, it appeared to Currington that its route would bring it close to his tow. Currington, therefore, used Channel 13 of his radio telephone to make two calls to the "Destrehan Ferry," but received no response. He then sounded a four-blast danger signal when the ferry was near midstream. Shortly after sounding this first danger signal, the bow of the ferry swung sharply to starboard, indicating to Currington that the ferry was turning downstream, he assumed, to pass astern of the BIGELOW. Approximately one minute later the bow of the ferry swung back hard to port, and reentered the crossing situation, directly in the BIGELOW's path. Currington again called the ferry on Channel 13 and got no response, so he blew a second danger signal and immediately backed down full astern.

## 18.

After the second danger signal it was too late to avoid hitting the ferry. Had Currington backed full astern after the first danger signal, some 60 seconds earlier, the collision would not have occurred. As it was, the port bow of the barge U–707 struck the starboard bow of the ferry at approximately 5:50 A.M. on February 4, 1974. There was personal injury and property damage as a result, but no loss of life. Captain Currington did not back down after the first danger signal because the ferry appeared to have changed its course and he assumed the ferry was going to go astern of the BIGELOW and its tow.

## 19.

Currington did not hear any radio communications or whistle signals from the ferry prior to the collision. He did, however, hear routine traffic on Channel 13 during the period of time that he observed the ferry crossing the river. Currington estimated the time interval between his last attempt to call the ferry and the collision as approximately 30 seconds.

## 20.

While the BIGELOW saw the ferry leaving the Luling landing, and the passengers on the ferry saw the BIGELOW heading upbound on the east bank of the river, Captain Nelson saw nothing. He maneuvered out into the river, heading toward the Destrehan landing on the east bank. As the ferry reached the middle of the river, where the current increases, Nelson testified that the force of the current swung the bow of the ferry to starboard, heading slightly downstream. Nelson stated that this was a normal occurrence, and part of what accounted for the backwards "S"

curve which the ferry always makes when it crosses the river at Luling/Destrehan. The ferry drifts downriver in this position for a brief time and is then pulled back upstream and heads over to the east bank so as to pull up and make a starboard landing at Destrehan. It was after pulling out of the mid-stream turn and heading back upriver towards the east bank landing that Nelson sighted a large black object on his starboard side at an estimated distance of 200 feet. Until this point in time, Nelson had heard no radio calls or whistle signals, nor had he sighted a tug and tow, either visually, by its lights, or on his radar.

### 21.

While Captain Nelson had not spotted the tow prior to completing the "S" turn, many of the passengers on the starboard deck of the ferry had seen the lights on the tow of the BIGELOW. Some of the passengers even heard at least one of the danger signals. When it appeared to the passengers that the ferry was continuing across the river in lieu of holding up to permit the tow to pass, they became alarmed by the imminence of danger of collision. Some of them left their vehicles and headed toward the port side of the ferry, seeking shelter, some commenced blowing their horns, and some began yelling. Nelson heard the noise of the passengers at about the same time that he saw the large black shape looming 200 feet to starboard.

### 22.

Nelson then realized that the shape was a barge, put the wheel hard to port and reversed the port engine to hard astern in an attempt to turn the ferry from the path of the oncoming tow. Nevertheless, within seconds after Nelson sighted the tow, the port bow of the Barge U–707 ran up and over the ferry's starboard bow. After the collision, Nelson saw the blinking amber light and the red running light on the tow, but stated that they were "dim."

### CONCLUSIONS OF LAW

This Court has jurisdiction of this cause by virtue of the admiralty and maritime nature of the claims involved. U.S.Const. art. III, § 2; 28 U.S.C. § 1333; Rule 9(h), Fed.R.Civ.P. In a collision case such as this, the Court will apply the principles and precedents of admiralty law, as well as the Navigation Rules of Red River of the North and Rivers Emptying in the Gulf of Mexico and Tributaries (hereinafter referred to as the Western River Rules), 33 U.S.C. § 301, et seq.; the Pilot Rules for Western Rivers, 33 C.F.R. § 95; and the Limitation of Liability Act, 46 U.S.C. § 181, et seq.

For the reasons which follow, the Court finds, as a matter of law, that the ferry GEORGE PRINCE was 100% at fault, and the M/V F. R. BIGELOW was 0% at fault in causing the February 4, 1974 collision, but that the State of Louisiana, Department of Highways, as owner of the GEORGE PRINCE, is entitled to limit its liability to the value of the ferry since the collision was caused by navigational errors which were outside the privity or knowledge of the State. Additionally, the Court finds that the policy of insurance issued by Dixie Auto Insurance Company covers the State's liability for this collision as owner of the ferry.

### I.

■ As the GEORGE PRINCE left the Luling ferry landing to head east across the Mississippi River to Destrehan, Louisiana, she entered into a crossing pattern with the M/V F. R. BIGELOW, headed upriver along the east bank, and pushing a tow ahead. Since the GEORGE PRINCE had the BIGELOW to starboard, she was the burdened vessel under Western River Rule 19, 33 U.S.C. 344, and as such, had a duty to keep out of the way of the BIGELOW and its tow.

The BIGELOW, meanwhile, was the privileged vessel under Rule 19 and had her own obligation to maintain her course and speed until it was obvious that the GEORGE PRINCE would not keep out of her way, 33 U.S.C. 348; see also, *Maroceano Compania Naviera, S.A. v. S.S. Verdi*, 438 F.2d 854 (2d Cir. 1971), cert. den. 404 U.S. 830, 92 S.Ct. 70, 30 L.Ed.2d 59 (1971).

The sole proximate cause of the collision was the failure of the GEORGE PRINCE to keep out of the way of the BIGELOW and its tow, in violation of Western River Rule 19, 33 U.S.C. 344. This failure was the result of several faults and errors of navigation on the part of the GEORGE PRINCE.

First, the GEORGE PRINCE was negligent in failing to see the BIGELOW and its tow, and to realize it was in a starboard crossing pattern. Although the passengers saw the tug and tow, Captain Nelson did not. The weight of the evidence was that the lights on the BIGELOW's tow were burning brightly and giving the proper navigational signals. Although the red and amber lights were improperly screened, a violation of 33 C.F.R. § 95.29, this was not a cause of the collision, and therefore, not a fault of the BIGELOW. Negligent failure of the captain to sight the tow visually was a fault of the GEORGE PRINCE.

Second, the inability of Captain Nelson to visually sight the BIGELOW was contributed to by the failure of the GEORGE PRINCE to have a lookout posted, a violation of 33 U.S.C. 351. Since the absence of a lookout contributed to the prime cause of the collision, the GEORGE PRINCE has not sustained its burden of proof under *The Pennsylvania,* 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874), to show that its statutory violation not only did not cause the collision, but could not have caused the collision, and therefore must be held at fault for failing to post a lookout. It must be noted that the BIGELOW also violated 33 U.S.C. 351 by failing to post a lookout. Nevertheless, Captain Currington saw the ferry visually from the pilothouse from the time the GEORGE PRINCE left the Luling landing until point of impact. Captain Currington had a clear visual map of every move the ferry made, at every distance that was important. Under the *Pennsylvania* rule, failure to provide a lookout could not have contributed to the collision where the captain of the vessel visually sights the other vessel at the first opportunity and continually observes it thereafter. *Guidry v. LeBeouf Bros. Towing Co., Inc.,* 398 F.Supp. 952 (E.D.La.1975). Therefore, the BIGELOW has sustained its burden and cannot be held at fault for failing to have a lookout.

The third fault of the GEORGE PRINCE was her negligent failure to hear either the radio calls or the first danger signal of the BIGELOW. Had the ferry properly monitored its radio, or heard the first danger signal of the BIGELOW, she would have been alerted to the presence of the tug and tow in enough time to avoid the collision. Therefore, this negligence was a proximate cause of the collision.

The M/V F. R. BIGELOW was not at fault in causing the February 4, 1974 collision. It has already been determined that her statutory violations with respect to her lights and the absence of a lookout were not causes of the collision, and therefore were not faults. It was additionally argued that her failure to back full astern after her first danger signal, when she still had time to avoid the accident, was a proximate cause of the collision. The Court cannot agree.

■ It is to be remembered that the BIGELOW was the privileged vessel under Rule 19, 33 U.S.C. 344. The privileged vessel in a Rule 19 crossing situation not only has a duty to maintain her course and speed, but has the right to assume that the burdened vessel will take the necessary steps to either cross astern of the privileged vessel, or to stop short of a projection of the privileged vessel's course. *United States v. S.S. Soya Atlantic,* 330 F.2d 732 (4th Cir. 1964). On the facts found above, the BIGELOW blew her first danger signal when it appeared that the GEORGE PRINCE was going to cross directly in front of the tow and a collision was likely. However, upon sounding that signal, the GEORGE PRINCE turned immediately to starboard, facing nearly downstream, and apparently attempting to heed the BIGELOW's four-whistle blast by going astern of the tug and tow. In fact, Currington assumed that this was the reason for the ferry's change in course, as he had a right to under the rule.

Hindsight now shows that the apparent course change of the GEORGE PRINCE was really only a natural part of the backwards "S" curve that she always makes when crossing the river at Luling/Destrehan, and that Captain Nelson never heard the first danger signal.

■ In spite of the fact that the ferry always completes her crossings with a backwards "S" curve, it was not proven at the trial that this procedure was of such general knowledge up and down the river as to be a "custom" or local practice such that Captain Currington should have been aware of it. Therefore, the Court finds that the BIGELOW was justified in interpreting the movements of the GEORGE PRINCE in response to its initial danger signal as an attempt to heed her duty as the burdened vessel and cross astern of the BIGELOW and her tow.

Once the ferry apparently turned to cross astern of the tug, the danger of collision was no longer imminent. With the danger abated, and the GEORGE PRINCE maneuvering to keep clear, the duty of the BIGELOW to keep her course and speed was even stronger than before. As was stated in *United States v. S.S. Soya Atlantic,* ibid., at p. 739:

> Any substantial weakening of the requirement of Rule 21 in these circumstances would frustrate one of the prime purposes of the Rule, to insure that the course and speed of the holding-on vessel may be predicted by the giving-way vessel. A requirement that the holding-on vessel alter her course or stop at a time when collision may be avoided by the giving-way vessel alone, and when the giving-way vessel has not indicated an intention not to comply with its obligation, would introduce uncertainties which would create unpredictable hazards for the giving-way vessel dutifully endeavoring to stay clear. If neither vessel was required to hold on until the danger of collision is obvious and imminent, neither would have a basis to predict the maneuvers of the other, and the avoiding action of the one, might be negatived by that of the other.

For example, on the instant facts, if the GEORGE PRINCE had truly been maneuvering to cross astern of the Bigelow, these movements would have been frustrated by the BIGELOW's backing up after the first danger signal, and the BIGELOW would have been at fault for violating 33 U.S.C. 348. See, for example, *Zim Israel Navigation Co. v. Steamship American Press,* 222 F.Supp. 947 (S.D.N.Y.1964), affirmed 336 F.2d 150 (2d Cir. 1964), cert. den. 380 U.S. 954, 85 S.Ct. 1089, 13 L.Ed.2d 971.

As it happens, the GEORGE PRINCE was *not* crossing astern, but merely completing her backwards "S" procedure. It was not until the GEORGE PRINCE swung back upriver and across the path of the BIGELOW that Captain Currington realized that the ferry was not going to comply with her obligation as the burdened vessel. It was then, and only then, that the BIGELOW became obliged to change her own course and take evasive measures to avoid a collision. The duty of the privileged vessel remains until " . . . such clear indication of an intention on the part of the burdened vessel to disregard her duty, . . [that] the danger is obvious and imminent and no longer avoidable by action of the burdened vessel alone." *United States v. S.S. Soya Atlantic, supra,* at 330 F.2d 739.

The BIGELOW, at this point, immediately sounded a second danger signal, and backed full astern. She was *in extremis,* put there by the negligence of the GEORGE PRINCE, and through no fault or lack of due care of her own. Under the circumstances, the BIGELOW acted prudently, within her rights and duties, and cannot be held at fault, either for failing to back down after the first danger signal or for inadequately responding to the second one.

For the foregoing reasons, the Court finds the GEORGE PRINCE to be 100% at fault, and the M/V F. R. BIGELOW to be 0% at fault.

## II.

Since it has been determined that the GEORGE PRINCE was at fault in causing

the collision, the next issue is whether the State of Louisiana, Department of Highways, as owner of the GEORGE PRINCE is entitled to limit its liability pursuant to 46 U.S.C. § 181, et seq.

The determination of whether a shipowner is entitled to limit his liability is a two-step process. First, the Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the Court must determine whether the shipowner had knowledge or privity of those *same* acts of negligence or conditions of unseaworthiness. For it is only knowledge of those factors which are found to have actually caused the accident, and not just any negligent acts or unseaworthy conditions, which preclude a shipowner's ability to limit. *Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir. 1976). In determining this issue, the shipowner has the burden of proof in establishing a lack of privity or knowledge, while the initial burden of proving negligence or unseaworthiness rests on the claimants. *Tittle v. Aldacosta,* 544 F.2d 752 (5th Cir. 1977).

It has been determined above that the GEORGE PRINCE was 100% at fault. The causative factors were found to be failure to post a lookout, failure to see the BIGELOW, failure to hear the danger signals or the radio calls of the BIGELOW— all navigational errors, or negligent acts on the part of the crew of the GEORGE PRINCE. The distinction between whether a cause of the collision is a negligent act, navigational error, or an unseaworthy condition of the vessel is a critical one in resolving the limitation issue. If the cause of the collision is either a negligent act or a navigational error on the part of the crew, then the shipowner is entitled to limit his liability. *Farrell Lines v. Jones, supra.* But if the causative factor was an unseaworthy condition of the vessel, then the reasoning is that such condition could have been, and should have been, discovered before the vessel left the dock, and therefore knowledge of the unseaworthy condition is imputed to the shipowner through his managerial agents, port captains, or marine su-

perintendents. *The Linseed King,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *The Cleveco,* 154 F.2d 605 (6th Cir. 1946); *Coleman v. Jahncke Service, Inc.,* 341 F.2d 956 (5th Cir. 1965), rehearing denied 348 F.2d 868, cert. denied 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465.

To illustrate the distinction, failure to post a lookout is negligence for which the shipowner may limit, *Complaint of B. F. T. No. Two Corp.,* 433 F.Supp. 854 (E.D.Pa. 1977), whereas failure to have a properly calibrated compass is an unseaworthy condition, the existence of which is imputable to the knowledge of the marine superintendent, and thus, to the owner, *Coleman v. Jahncke Service, Inc., supra.* The most frequently found unseaworthy condition is some mechanical or structural defect or deficiency in the vessel, *Coleman v. Jahncke Service, Inc.,* (defective compass); *The Linseed King, supra* (vessel unable to run through ice). From time to time negligent crews have been themselves argued to be unseaworthy conditions, *Farrell Lines, Inc. v. Jones, supra; Tug Ocean Prince, Inc. v. U. S.,* 436 F.Supp. 907 (S.D.N.Y.1977); however, the courts have been reluctant to so hold.

In the *Tug Ocean Prince,* a licensed captain was navigating the Hudson River in wintertime, when the river was choked with ice. Submerged rocks in the river were marked by a buoy which, it was commonly known on the river and mentioned in the charts, could be moved, or even obscured altogether, by the ice. The captain of the tug was an experienced pilot but had never before navigated the Hudson, much less in the winter, much less in ice. He also did not avail himself of the advice in the charts, or request the assistance of an experienced pilot who was on the tug, but not in the pilothouse, although he knew the buoy existed. As it happened, the buoy on the night in question was obscured by ice, and the tug struck the submerged rocks. The claimants argued that the tug was unseaworthy because of the captain's inexperience with the river. The court, however, rejected the argument and said that it was

the captain's negligence in not reading the chart advice, not asking for assistance, and not using an additional aid to navigation such as radar that caused the failure to locate the rocks, and that these were navigational errors which could not be imputed to the tug's owners.

Likewise, in *Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir. 1976), the Court stated at p. 12:

> In sum, neither the absence of an additional watch officer nor the location of the rudder angle indicator involved negligence or rendered the vessel unseaworthy. Although the presence of an additional officer or the relocation of the indicator might have reduced the possibility of collision, that is not the standard by which we are to determine whether Farrell is entitled to limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel *reasonably* fit under the circumstances. Here, we conclude . . . that the vessel as equipped was reasonably capable of performing the intended mission if properly operated. The accident resulted from lack of care and failure to exercise proper procedures by those on the bridge. For this Farrell is liable, but is also entitled to limit. (citations omitted).

In fact, the only case which this Court could find where the incompetency or inadequacy of the crew was deemed an unseaworthy condition which caused the accident for which limitation was sought was *Avera v. Florida Towing Corp.,* 322 F.2d 155 (5th Cir. 1963). In that case a 17-year-old with no maritime experience whatever was hired as a deckhand and injured as a direct result of his own inexperience. There the Court held that the fault of letting the plaintiff sail with the tug was within the owner's privity or knowledge and limitation was denied.

■ In the case before the Court, there was no mechanical failure. Both radio and radar were in good working condition, and Captain Nelson was competent to use each. The GEORGE PRINCE was not unseaworthy unless Captain Nelson were determined to be so grossly incompetent as to render it

so. On the basis of the evidence produced at trial, this Court is not willing to make such a finding.

In order for the Court to deny limitation to the State, it would have to find that the causative factors of the February 4, 1974 collision were within the privity or knowledge of the State. The causative factors were found to be failure to post a lookout, see the BIGELOW, or hear its signals. Ordinarily these would be deemed navigational errors and not imputable to the State's knowledge. Knowledge is imputable to shore-based personnel only of unseaworthy conditions which cause the collision. For that to exist here, Captain Nelson himself, who did not see the BIGELOW, and did not hear the whistles or the radio calls, would have to be the unseaworthy condition. Although much effort was made at trial to infer that he was untrained and unskilled, he had many years of maritime experience, was a licensed river pilot, and except for two very minor incidents in which, for example, the ferry briefly got caught up in some trees, had an otherwise respectable track record during the period in which he operated the Luling ferry. Solely on the basis of the evidence presented at this trial, the Court cannot declare the GEORGE PRINCE to have been unseaworthy as a result of having Captain Nelson at the helm, and is therefore compelled, under the line of authority discussed above, to allow the State to limit its liability to the value of the GEORGE PRINCE at the time of the collision.

### III.

■ Dixie Auto Insurance Company had policy No. GLD 990002 in full force and effect on February 4, 1974. That policy was an Owners', Landlords' and Tenants' Policy, with the State of Louisiana, Department of Highways as a named insured. See, exhibit, Landeche No. 1.

At trial, Dixie Auto argued that this policy did not cover the State's liability for the collision because it did not contain a "maritime endorsement." This argument is specious, and counsel has supplied the Court no

legal authority to support it. A clear reading of the policy reveals that the GEORGE PRINCE is listed as an insured vessel (endorsement No. 1), including its adjacent ways and means at any location in Louisiana (endorsement No. 2), but excluding any liability arising under either the Jones Act or the Longshoreman's Act (endorsement No. 5). This clearly covers the owner's liability to passengers on the GEORGE PRINCE for bodily injury or property damage sustained on the vessel, and there is no exclusion to the contrary. A "maritime endorsement" does not appear to be necessary to complete coverage. Therefore, the Court rejects the argument of Dixie Auto, and holds that policy No. GLD 990002 does cover the collision in question.

The further question remains as to the orderly disposition of funds at the trial on damages. The insurance proceeds are not subject to the owner's right to limit, and therefore not technically a part of the limitation fund, *The City of Norwich*, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886), although the shipowner has an interest in not having the proceeds exhausted by the claimants before the extent of his own liability can be covered by them, *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954). Therefore, the formula has been established whereby once the amount of the limitation fund has been determined, the insurer pays the proceeds into the fund up to the maximum limit of the fund, the claimants are paid their pro rata share of the fund, and then they proceed directly against the remainder of the insurance proceeds for the remainder of their claims. *Maryland Casualty Co. v. Cushing*, ibid.

In the present case, when the State filed its petition for limitation, it attached an affidavit that the value of the GEORGE PRINCE was $145,000.00. Several claimants contested that value, but have supplied no countervailing evidence of a different value to date. At the trial on damages, therefore, the various claimants will have to prove the amounts of their individual claims. Any claimant wishing to contest the value of the GEORGE PRINCE, will have to prove that it is other than as stated by the State. If the value of the claims exceeds the value of the ferry, then the value of the ferry will be the limitation fund. Dixie Auto will then pay to the State the amount of the fund, and a pro rata share will be paid to the claimants. If there are any insurance proceeds remaining, the remaining claims will be paid from those proceeds.

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED that preparations proceed for TRIAL on the issue of damages, and thereafter judgment issue.