FILED
United States Court of Appeals
Tenth Circuit

August 1, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

In re: ARAMARK SPORTS AND
ENTERTAINMENT SERVICES, LLC, a
Delaware limited liability company, as
owner of a certain 20' 2007 Baja Islander
202 for exoneration from or limitation of
liability,

       Plaintiff - Appellant.

No. 14-4118

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:09-CV-00637-TC-PMW)**
_____

John R. Lund (Alan S. Mouritsen, with him on the briefs), Parsons Behle & Latimer, Salt
Lake City, Utah, for Appellant.

Daniel Benchoff, (M.E. "Buddy" Rake, Jr., with him on the brief) Rake Law Group, P.C.,
Phoenix, Arizona, for Appellees.
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

      This suit arose out of a recreational boating accident on Lake Powell that claimed

the lives of four adults.  The boat had been rented from Aramark Sports and

Entertainment Services, LLC.  Because the accident occurred on navigable waters, the

case falls within federal admiralty jurisdiction.  *See Foremost Ins. Co. v. Richardson*, 457

U.S. 668 (1982). Anticipating that it would be sued for damages, Aramark filed in the United States District Court for the District of Utah a petition under the Limitation of Liability Act, 46 U.S.C. §§ 30501–12, which permits a boat owner to obtain a ruling exonerating it or limiting its liability based on the capacity or value of the boat and freight. The district court denied the petition, leaving for further proceedings the issues of gross negligence, comparative fault, and the amount of damages. Aramark appeals the denial. After determining that we have appellate jurisdiction, we hold that the district court erred in its application of admiralty principles of duty and remand for further proceedings.

## I.   BACKGROUND

### A. The Accident

Aramark rents boats out of the Wahweap Marina on Lake Powell, near the Utah-Arizona border. In April 2009 three married couples—the Bradys, the Prescotts, and the Tarantos—went on vacation to Lake Powell. On Friday, April 24 the Bradys and Prescotts went to Aramark's boat rental office at Wahweap to procure a boat for the next day. Mr. Prescott signed a contract to rent a Baja 202 Islander, which is classified in the owner's manual as a Design Category C boat based on its limited "ability to withstand wind and sea or water conditions." Aplee. Supp. App., Vol. 4 at 417. For Category C boats the manual lists a "Maximum wind speed" of 27 knots (31 miles per hour). The manual further states:

> The wind speed and wave height specified as the upper limit for your
> category of boat does not mean that you or your passengers can survive if

2

your boat is exposed to these conditions. It is only the most experienced operators and crew that may be able to operate a boat safely under these conditions. You must always be aware of weather conditions and head for port or protected waters in sufficient time to avoid being caught in high winds and rough water. Do not take chances!

*Id.* The boaters were never informed of the Baja's Category-C classification.

When the contract was signed, the National Weather Service (NWS) forecast for the next day on Lake Powell called for breezes from 15–23 miles per hour and gusts up to 37 miles per hour. That forecast was based on data collected at 3:44 a.m. that morning. Before the boaters left, Aramark rental agent Phyllis Coon gave that forecast to Mr. Prescott and told him that he would be given an updated forecast the next morning when they picked up the boat.

Early Saturday morning the NWS updated its Lake Powell forecast for noon to 6 p.m. on Saturday to call for sustained winds of 25 to 35 miles per hour and gusts as high as 55 miles per hour. When the three couples arrived on Saturday morning to begin their trip, Aramark's boat-rental instructor, who told the boaters about the weather channel on the boat's radio, did not inform them of the updated forecast, nor did they request it. He asked Mr. Brady if he knew how to use the radio and Mr. Brady said he did.

The group left Wahweap at about 8 a.m. and safely arrived at their planned destination, Rainbow Bridge. On their return trip to Wahweap, they stopped to refuel at Dangling Rope Marina, also operated by Aramark. Aramark employee Scott Bergantz spoke with some of them during the stop. He testified by deposition that because the water was rough he invited the couples to stay at Dangling Rope if they were

3

uncomfortable. This testimony is disputed, and the district court made no findings concerning any offer of hospitality.

Mr. Brady testified that after his group left Dangling Rope the water was "bumpy" and then "got rough" as they entered a small bay. Aplt. App. at 103. The boat proceeded through a "small opening" and then into "a larger bay, which turned out to be Padre Bay," at which point "the wind came up like unbelievable. It was ruthless." *Id.* at 104. At one point Mrs. Brady noticed water at her feet inside the boat and then heard her husband issue a mayday call. The boat sank shortly thereafter. The Bradys were able to reach a rock pile from which they were later rescued. The Prescotts and Tarantos lost their lives.

## B. Governing Law

Admiralty law is not a commonplace in the Tenth Circuit, so a brief introduction to some relevant law may be useful.

### 1. Admiralty and Maritime Jurisdiction

The United States Constitution extends the "judicial power to . . . all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. The first Congress enacted a statute under that authority, stating: "[T]he district courts shall have . . . exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 76–77. The second clause is often referred to as the saving-to-suitors clause. The original statute has

4

been amended several times and now reads: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."[1] 28 U.S.C. § 1333. The Supreme Court has said that despite the change in language, the "substance [of the saving-to-suitors clause] has remained largely unchanged." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 443–44 (2001).

That substance is quite broad. For the most part, the saving-to-suitors clause has been construed to permit in personam claims within federal admiralty and maritime jurisdiction to be brought in state court as well as in federal court. *See Lewis*, 531 U.S. at 445 ("[T]he saving to suitors clause [is] a grant to state courts of *in personam* jurisdiction, concurrent with admiralty courts."); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 1–13, at 40 (2d ed. 1975) ("Where the suit is in personam, it may be brought *either* in federal court under the admiralty jurisdiction . . . *or*, under the saving clause, in an appropriate non-maritime court, by ordinary civil action."). "The right of a common law remedy, so saved to suitors, . . . . includes remedies *in pais,* as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law." *Lewis*, 531 U.S. at 445 (internal quotation marks omitted).

But note that the saving-to-suitors clause preserves "remedies" not "rights." *See* 28 U.S.C. § 1333(1) ("saving to suitors in all cases all other remedies to which they are

---

[1] 28 U.S.C. § 1333(2) relates to prizes under admiralty and maritime law.

5

otherwise entitled"). Federal maritime and admiralty law still controls the applicable substantive law. The clause's scope "does not . . . include attempted changes by the States in the substantive admiralty law, but it does include all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved." *Lewis*, 531 U.S. at 445 (ellipsis and internal quotation marks omitted). One particular attraction of proceeding under the saving-to-suitors clause is that there is generally a right to trial by jury in state-court proceedings but, absent some limited statutory exceptions, there is no right to a jury in an action brought under admiralty or maritime jurisdiction. *See Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 363, 368–69 (1959); 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 21-10, at 571–74 (5th ed. 2011); Fed. R. Civ. P. 38(e) ("These rules do not create a right to a jury trial on issues in a claim that is an admiralty or maritime claim under Rule 9(h).").

Thus, the *exclusive* federal jurisdiction expressed at the outset of 28 U.S.C. § 1333 does not live up to its apparent promise. That is not to say, however, that the promise is empty. There is exclusive federal jurisdiction to hear an in rem action against a vessel or other maritime property, "[a] procedure unique to American admiralty practice" in which the "action is brought against the vessel itself as defendant." 2 Schoenbaum, *supra*, § 21-3, at 535; *see Lewis*, 531 U.S. at 444 ("[P]roceedings *in rem* were deemed outside the scope of the [saving-to-suitors] clause because an *in rem* action was not a common law remedy, but instead a proceeding under civil law"). And state-court proceedings are

6

restricted by the statute employed by Aramark here—the Limitation of Liability Act. We now turn to that statute.

### 2. The Limitation of Liability Act

Congress enacted the Limitation of Liability Act in 1851 "to encourage ship-building and to induce capitalists to invest money in this branch of industry." *Lewis*, 531 U.S. at 446 (internal quotation marks omitted). It was following the lead of other nations. *See Norwich & N.Y. Transp. Co. v. Wright*, 80 U.S. 104, 120 (1871). In the seventeenth century the Dutch scholar Hugo Grotius had written that "men would be deterred from investing in ships if they thereby incurred the apprehension of being rendered liable to an indefinite amount by the acts of the master." *Id.* at 116. Various European nations had therefore adopted laws limiting the owner's liability to the value of the ship and freight. *See id.* at 116–17. In England, for example, once a ship owner confessed liability and paid the value of the ship and freight into court, his exposure would be limited to that sum and he would have the right to stay any suit against him for damages. *See id.* at 118.

The current version of the Limitation of Liability Act was codified in 2006 at 46 U.S.C. § 30501 *et seq.*[2] Its key provision limits the boat owner's liability to the limitation fund—"the value of the vessel and pending freight," *id.* at § 30505(a)— provided that the acts giving rise to the damage occurred "without the privity or knowledge of the owner,"

---

[2] Many pre-2006 cases reference the Act at its then-locus, 46 U.S.C. App. § 181 *et seq. See, e.g.*, *Lewis*, 531 U.S. at 441.

*see id.* at § 30505(b).[3]  The vessel's value is measured "*after* the voyage on which the incident occurred.  Thus if the ship is lost, the value is zero."  *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 449 (4th Cir. 1999) (citation omitted) (internal quotation mark omitted).  *Pending freight* is "the total earnings for the voyage, both prepaid and uncollected."  *In re Caribbean Sea Transp., Ltd.*, 748 F.2d 622, 626 (11th Cir. 1984).  If the limitation fund is insufficient to pay all claims, it is divided by claimants "in proportion to their respective losses."  46 U.S.C. § 30507.  For personal-injury or death claims the cap on liability may be increased to $420 times the tonnage of the vessel; but this applies only to a "seagoing" vessel, *id.* at § 30506—that is, one that "does, or is intended to, navigate in the seas beyond the Boundary Line in the regular course of [their] operations," *In re Talbott Big Foot, Inc.*, 854 F.2d 758, 761 (5th Cir. 1988); *see id.* ("The Boundary Line is that line which divides the high seas from rivers, harbors, and inland waters.").

---

[3] 46 U.S.C. § 30505 states:

> (a) In general.  Except as provided in section 30506 of this title [relating to claims for personal injury or death], the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight.  If the vessel has more than one owner, the proportionate share of the liability of any one owner shall not exceed that owner's proportionate interest in the vessel and pending freight.
> (b) Claims subject to limitation.  Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.
> (c) Wages.  Subsection (a) does not apply to a claim for wages.

"[F]ederal courts have exclusive jurisdiction to determine whether a vessel owner is entitled to limited liability." *Lewis*, 531 U.S. at 442. To govern procedures under the Limitation Act, the Supreme Court promulgated rules a century and a half ago. The current version of those rules is found in Rule F (entitled "Limitation of Liability") of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Under Rule F a ship owner seeking limitation must file a complaint "set[ting] forth the facts on the basis of which the right to limit liability is asserted and all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited." Fed. R. Civ. P. Supp. Admiralty Rule F(2). Necessary facts include a description of the voyage, the amount of any pending demands against the owner, and the present value of the vessel. *See id.* Once the owner files the complaint and deposits with the court or a trustee an amount equal to the limitation fund (or security therefor), plus security for costs and interest, "all claims and proceedings against the owner or the owner's property with respect to the matter in question shall cease"; and if moved to do so by the ship owner, "the court shall enjoin the further prosecution of any action or proceeding . . . subject to limitation in the action." *Id.* at F(3). If the court grants limitation, it then distributes the limitation fund "pro rata, subject to all relevant provisions of law, among the several claimants in proportion to the amounts of their respective claims, duly proved." *Id.* at F(8).

Rule F echoes much of the procedure under prior English law. *See generally Norwich*, 80 U.S. at 117–20. But it is not identical. One innovation has been in the rule

9

since first promulgated in 1871.  Although English practice required the owner to admit his liability at the outset, the Supreme Court thought that such an admission "is, perhaps, not necessary in an admiralty court."  *Id.* at 124.  Under Rule F, "[i]n the process of seeking limited liability, the owner [is] permitted to contest the fact of liability," *Lewis*, 531 U.S. at 447; *see* Rule F(2) (the complaint may "demand exoneration from as well as limitation of liability").

"The determination of whether a shipowner is entitled to limitation employs a two-step process."  *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).  "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident."  *Id.*  "Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness."  *Id.*  There are three possible outcomes to a limitation petition:  exoneration, limitation, or no limitation.  If no negligence is shown, the inquiry ends and the district court will typically issue an order exonerating the owner from liability.  *See In re Trawler Snoopy, Inc.*, 268 F. Supp. 951, 953 (D. Me. 1967) ("If no liability is found to exist, the petitioner is entitled to a decree of exoneration, and there is no need to consider the claim to limitation.").  If claimants demonstrate negligence, the burden shifts to the owner to show lack of privity or knowledge.  *See Farrell Lines*, 530 F.2d at 10.  If the owner meets this burden, the court caps the owner's liability at the value of the vessel and pending freight, resolves the claims, and apportions the fund.  *See* Rule F(8).  But if the owner fails to establish lack of privity or knowledge, the court denies the limitation petition and the

10

owner is as fully liable as it would have been absent the Limitation Act. *See* 46 U.S.C. § 30505. The claimant then may pursue relief in any suitable forum. *See Pickle*, 174 F.3d at 449 ("If the shipowner fails to establish its right under the Limitation Act and limitation is therefore denied, the claimants are released to pursue their original claims in full."); *Wheeler v. Marine Navigation Sulphur Carriers, Inc.*, 764 F.2d 1008, 1011 (4th Cir. 1985) ("Each circuit that has considered this question has ruled that once limitation is denied, plaintiffs should be permitted to elect whether to remain in the limitation proceeding or to revive their original claims in their original fora."). *See generally* Gilmore & Black, *supra*, § 10–41, at 935 (when limitation is denied, "[t]he lower courts have on the whole found that . . . plaintiffs, by virtue of the saving to suitors clause, should be allowed to choose the forum of litigation").

Although a limitation-of-liability proceeding may fully dispose of a maritime claim against a ship owner, that is not always the case. As noted in the previous paragraph, if the limitation court does not exonerate or limit the liability of the defendant, the claim can proceed in another court. And even if the vessel's owner succeeds in limiting liability, proceedings may then move to another venue as long as the owner's right to limitation is protected. *See Lewis*, 531 U.S. at 454–55. For example, when the sum of all claims is less than the limitation fund, and thus does not threaten the owner with liability exceeding the fund, the federal court hearing the limitation-of-liability proceeding may lift the injunction against other proceedings and allow litigation of the claims in state court. *See id.* at 450–51. Similarly, when a single claimant agrees not to

seek a recovery greater than the limitation fund, the federal court should permit the claim to proceed elsewhere. *See id.* at 448–50. The owner may even plead the defense of limitation in state court rather than file a limitation action in federal district court. *See Langnes v. Green*, 282 U.S. 531, 541–43 (1931); *Cody v. Phil's Towing Co.*, 247 F. Supp. 2d 688, 691 (W.D. Pa. 2002) ("Although a limitation proceeding commonly is commenced as a separate action by the filing of a petition, invocation of the statutory rights created by the Act also can be accomplished through a plea of limited liability asserted in the answer to a plaintiff's complaint."); 2 Schoenbaum, *supra*, § 15-5, at 181 ("Limitation may be invoked either as a defense to an action seeking damages or as an independent complaint in admiralty."); Gilmore & Black, *supra*, § 10–14, at 853 n.52. In such instances the state court can resolve certain limitation-related issues, such as the limitation amount. *See Langnes*, 282 U.S. at 543. But the state court lacks jurisdiction to consider the owner's entitlement to limitation; if a plaintiff wishes to challenge that entitlement, the federal district court, not the state court, "has exclusive cognizance of such a question." *Id.*; *see Lewis*, 531 U.S. at 442. The federal court may therefore retain jurisdiction over a limitation action while the litigation proceeds in state court, just in case the state-court litigation threatens the owner's limitation rights. *See Lewis*, 531 U.S. at 448–50, 453–55.

### C. Procedural History

Aramark filed a limitation complaint in federal court before any claim against it had been brought. The estates and heirs of the Prescotts and Tarantos (Claimants) filed

12

answers and counterclaims seeking damages for wrongful death. The Bradys, who are not parties to this appeal, filed an answer and counterclaim that did not seek damages but sought indemnification from Aramark in case they were held liable for the deaths of the Tarantos or the Prescotts. Claimants then successfully moved to bifurcate the limitations issues from those raised by their counterclaims for wrongful death, for which they claimed the right to a jury trial. The court left for later resolution whether, if Aramark failed on its limitation complaint, to grant Claimants' request to proceed in state court on their wrongful-death claims. Phase one was a bench trial on the limitation issue, leaving nonlimitation issues such as gross negligence, damages, and apportionment of fault for a phase-two jury trial. The court found that negligence had "at least in part" caused the accident and that such negligence was within Aramark's privity or knowledge. It therefore could not exonerate Aramark from liability and denied Aramark's petition for limitation.

## II.    APPELLATE JURISDICTION

Before addressing the merits, we must assure ourselves of our appellate jurisdiction. Aramark asserts that jurisdiction lies under 28 U.S.C. § 1292(a)(3), which states that "courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory decrees of . . . district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."

Claimants argue that § 1292(a)(3) does not grant us jurisdiction because "the district court did not fully or ultimately determine the rights and liabilities of the parties

13

or the merits of the controversy between them." Aplee. Br. at 2. In particular, they point out that the court "did not pass upon various issues pertaining to liability and the merits of the controversy," such as their "allegations of gross negligence, request for punitive damages, and allocation of degrees of fault as well as compensatory damages." *Id.*

This argument would be convincing if jurisdiction under 28 U.S.C. § 1291 were being invoked. That section restricts appellate jurisdiction to "final decisions" of the district courts, and the unresolved issues pointed out by Claimants would prevent the court's decision below from being final. *See, e.g.*, *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976) ("[J]udgments [limited to the issue of liability] are by their terms interlocutory, and where assessment of damages or awarding of other relief remains to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291." (citation and internal quotation marks omitted)); *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 970 (10th Cir. 2006) ("Because further proceedings are necessary to determine causation and the amount of damages, if any, the district court's order is not final and the grant of Plaintiffs' motion is not immediately appealable [under § 1291]."); *Albright v. UNUM Life Ins. Co. of Am.*, 59 F.3d 1089, 1092 (10th Cir. 1995) (noting "the general and well-established rule that an order that determines liability but leaves damages to be calculated is not final" (internal quotation marks omitted)).

But the bailiwick of § 1292(a)(3) is not final decisions. It is "interlocutory decrees" in admiralty "cases in which appeals from final decrees are allowed." Since the statute was enacted in 1925, *see Schoenamsgruber v. Hamburg Am. Line*, 294 U.S. 454,

14

457 (1935), federal courts have been consistent in giving the statutory language its plain meaning: all that is required is that a right or liability of a party have been determined. As stated in one of the earlier appellate decisions on the statute:

> It is obvious that [the statutory language] does not mean *all* the rights and liabilities of the parties for, if so, the only appeal allowable is from the final decree denying any limitation and determining the amount of the claims and their share of the fund. The question is, Is *any* right of [the appellant] finally determined by the decree fixing the limit of liability?

*Rice Growers Ass'n of Cal. v. Rederiaktiebolaget Frode*, 171 F.2d 662, 663 (9th Cir. 1948) (emphasis added).

The decision in *In re S.S. Tropic Breeze*, 456 F.2d 137 (1st Cir. 1972), illustrates how far appellate courts have gone in hearing appeals under § 1292(a)(3) when liability is at issue. The ship had been libeled to pay crew wages. *See id.* at 138. Tropical Commerce Corporation had chartered the vessel and installed cement equipment. *See id.* A party with a mortgage on the vessel had argued in district court that Tropical could claim an interest in the cement equipment only out of the proceeds of the ship's sale, but the court had ruled that the mortgagee was bound by a stipulation to pay Tropical the value of the equipment, provided that Tropical actually owned the equipment. *See id.* The court referred to a master the issues of whether Tropical owned the equipment and its value. *See id.* The mortgagee appealed the ruling that it could itself be liable to Tropical for the equipment's value, rather than Tropical being limited to collecting out of the proceeds of the ship's sale. *See id.* Tropical moved to dismiss the appeal because the

15

issues of ownership and value were still to be determined.  The First Circuit denied the motion, relying on § 1292(a)(3).  It wrote:

> It is true that the usual interlocutory appeal under section 1292(a) (3) is from an order finally determining that one party is liable to another and referring the cause to an assessor for the determination of damages.  The statute is not limited to such situations, however, but, rather, applies to any decree finally determining the liability of one of the parties, even if it leaves open an issue which may, ultimately preclude recovery by a particular plaintiff.

*Id.* at 139 (citations omitted).  "The fact that this question [of Tropical's title] was left open," wrote the court, "does not mean that the court did not adequately determine rights within the meaning of 28 U.S.C. § 1292(a) (3), which broadly permits admiralty appeals." *Id.*

Section 1292(a)(3) was designed to allow ship owners to seek an appeal to halt litigation at an early stage, in the hope of eliminating the need for further proceedings.  "Congress intended 28 U.S.C. § 1292(a)(3) to permit parties to appeal the finding of liability on the merits, before undergoing the long, burdensome, and perhaps unnecessary damages proceeding." *Evergreen Int'l (USA) Corp. v. Standard Warehouse*, 33 F.3d 420, 424 (4th Cir. 1994); *see also United States v. The Lake George*, 224 F.2d 117, 118 (3d Cir. 1955) ("[T]he classic example of [§ 1292(a)(3)'s] day-to-day operation is presented when there is a determination of liability as distinguished from amount.").  To be sure, not every district-court ruling on a potentially dispositive issue in an admiralty suit is appealable under § 1292(a)(3).  *See Schoenamsgruber*, 294 U.S. at 458 (denying right to appeal order to arbitrate maritime claims); *In re Ingram Towing Co.*, 59 F.3d 513, 517

16

(5th Cir. 1995) ("Orders which do not determine parties' substantive rights or liabilities . . . are not appealable under section 1292(a)(3) even if those orders have important procedural consequences." (internal quotation marks omitted)).  The decision to be reviewed must have involved substantive "rights and liabilities."  But that is the case here.  There has been a determination of liability, the express concern of the jurisdictional statute—Aramark was not exonerated and would have to pay *some* damages, with the amount depending on how much at fault others were, whether Aramark was grossly negligent, and how much in damages was suffered by Claimants.

There is particular reason to permit appeals of denials of limitation or exoneration, because the dispute is then likely to go to another court.  If the ship owner files a limitation claim after suit has been brought against it in a different forum (say, a state court), the earlier suit would be stayed during the limitation proceeding, but the stay would be lifted if limitation and exoneration are denied.  And even if the limitation action is filed before suit is brought against the owner, the claimants may wish to proceed elsewhere once the limitation issue has been resolved.  For example, in *Lewis* the Supreme Court approved the district court's order permitting a suit to proceed in state court even though the vessel owner filed for limitation in federal court before the plaintiff had sued in state court and the plaintiff had counterclaimed for personal-injury damages in the federal suit.  *See* 531 U.S. at 441.  (The district court had ruled that it was not necessary to resolve the limitation issue because the plaintiff's claim was less than the limitation fund conceded by the owner (although the court retained jurisdiction to protect

17

the owner's limitation rights in case the state-court judgment exceeded the limitation amount).  *See In re Lewis & Clark Marine, Inc.*, 31 F. Supp. 2d 1164, 1169–70 (E.D. Mo. 1998).)  Indeed, Claimants have sought to continue this litigation in state court.  *See* Motion to Bifurcate at 2, *In re Aramark*, No. 2:09-cv-00637-TC-PMW, Doc. No. 173 (D. Utah Oct. 30, 2012).  Why wait (even if federal appellate practice permitted that course) till state-court litigation has concluded before taking an appeal of the limitation ruling?  Such delay could be particularly problematic because the federal district court's rejection of Aramark's limitation complaint "is res judicata on the issue of liability."  *Republic of France v. United States*, 290 F.2d 395, 397 (5th Cir. 1961).  It makes sense to resolve finally (through appellate review) those limitation rulings to which the state court must defer during its proceedings, rather than conducting a federal appeal after a state-court judgment and thereby risking the need for a state retrial if the federal appeal leads to reversal.  The value of comity between jurisdictions suggests avoiding such offense to state proceedings.

It is therefore not surprising that appellate courts have regularly exercised jurisdiction over denials of petitions for limitation of liability.  *See, e.g.*, *In re Bankers Trust Co.*, 651 F.2d 160, 163–64 (3d Cir. 1981) (reversing denial of limitation); *Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d 724, 727 (9th Cir. 1969) (affirming denial); *Coleman v. Jahncke Serv., Inc.*, 341 F.2d 956, 957 (5th Cir. 1965) (affirming denial); *Republic of France*, 290 F.2d at 401 (reversing denial).

*Republic of France* is illustrative. The United States sued France following a horrendous explosion (the Texas City Disaster) started on a French ship loaded with fertilizer-grade ammonium nitrate manufactured by the United States. *See* 290 F.2d at 396. It sued in two capacities: first, as the assignee of hundreds of individual claims for deaths, personal injuries, and property damages, for which the United States had paid the claimants an aggregate sum of $16 million; second, as successor to the Reconstruction Finance Corporation, which had lost $350,000 in goods. *See id.* France filed a limitation action, *see id.*, but the district court found France negligent and declined to exonerate it or limit its liability, *see id.* at 398. Admiralty law at that time permitted damages to be reduced for a claimant's own negligence, *see Pope & Talbot v. Hawn*, 346 U.S. 406, 409 (1953) (contributory negligence can be considered "in mitigation of damages as justice requires"), and the United States conceded that the court had not yet adjudicated France's claim that the United States was negligent, *see Republic of France*, 290 F.2d at 397 n.4. In addition, the United States still had to prove liability on its asserted claims (presumably by establishing causation for the alleged damages to property and for the personal injury or death of the hundreds of persons whose claims had been assigned to it). *See id.* Yet after acknowledging that "[t]he only ultimate issue so far determined by the district court is that the petitioners are not entitled to exoneration from or limitation of liability," the court of appeals still found jurisdiction under § 1292(a)(3) on the ground that the district court "finally determined the rights and liabilities of the parties by denying the petition for exoneration from or limitation of liability." *Id.* at 397. Similarly,

19

here the district court denied limitation and exoneration. That suffices to establish our jurisdiction under § 1292(a)(3), even though the district court declined to rule on nonlimitation issues.

Citing *Becker v. Poling Transportation Corp.*, 356 F.3d 381, 387–88 (2d Cir. 2004), and other cases, Claimants assert that "[s]ection 1292(a)(3) is construed narrowly." Aplee. Br. at 1. But these cases stand for nothing more than that the statute will not be stretched to include matters beyond its purview, which is rulings determining "the rights and liabilities of the parties to admiralty cases." 28 U.S.C. § 1292(a)(3). Two of the cited cases actually held that the appellate court had jurisdiction. *Becker*, which expressly stated that the statute confers appellate jurisdiction even when the district court "has left unsettled the assessment of damages or other details required to be determined prior to entry of a final decree," 356 F.3d at 387, decided that it had jurisdiction to hear an appeal from an interlocutory ruling that held the appellant liable for a fire but left open some claims for indemnity and contribution, *see id.* at 386–88. And in *Deering v. National Maintenance & Repair, Inc.*, 627 F.3d 1039, 1041–43 (7th Cir. 2010), the court exercised jurisdiction over an appeal from an order dismissing a counterclaim. Also, in two cited cases denying appellate jurisdiction the appealed decision had not addressed liability. *See Evergreen*, 33 F.3d at 422–25 (declining to exercise jurisdiction over appeal of order granting summary judgment to defendants because claims should have been brought in arbitration); *Astarte Shipping Co. v. Allied Steel & Exp. Serv.*, 767 F.2d 86, 88 (5th Cir. 1985) (order confirming an attachment in admiralty is not appealable under

20

§ 1292(a)(3) because it does not determine the rights and liabilities of the parties). As for the two remaining cited cases, the courts held that they lacked appellate jurisdiction to resolve an *issue* concerning liability because there remained other issues to be resolved before it could be known whether the party had any liability. In *Francis ex rel. Francis v. Forest Oil Corp.*, 798 F.2d 147, 149–50 (5th Cir. 1986) (per curiam), the Fifth Circuit ruled that it had no jurisdiction to hear an appeal of the district court's order denying a summary-judgment motion that had asserted that the wrongful-death claims had been contractually released, thereby leaving liability for trial. And in *The Lake George*, the Third Circuit ruled that it lacked jurisdiction to hear the appeal of a district-court order dismissing one of four causes of action seeking forfeiture, 224 F.2d at 118–19; because three other causes of action remained live, it said, "[t]he liability of the vessel to forfeiture has yet to be determined," *id.* at 119. We need not decide whether we agree with those two decisions because in our case the district court definitively resolved that Aramark would bear liability for the accident. In any event, whatever the precise implications of these two opinions, we can be confident that they do not cast doubt on our jurisdiction in this case. Both the Third and Fifth Circuits have held that the denial of limitation and exoneration is appealable. *See In re Bankers Trust*, 651 F.2d at 163–64 (3d Cir.); *Republic of France*, 290 F.2d at 401 (5th Cir.).

Claimants have not cited, nor are we aware of, any decision rejecting appellate jurisdiction over a denial of limitation and exoneration. We hold that we have jurisdiction over this appeal. We therefore turn to the merits.

21

## III.    EXONERATION?

A two-step process governs whether a ship owner is entitled to limitation or exoneration. "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines*, 530 F.2d at 10. Because Claimants do not assert unseaworthiness and Aramark does not claim lack of privity or knowledge, the two-step inquiry in this case boils down to whether negligence by Aramark caused the accident.

The question of negligence is governed by federal maritime law. "With admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *see* 1 Schoenbaum, *supra*, § 5-2, at 251 ("[O]nce admiralty jurisdiction is established . . . a plaintiff's case will be determined under principles of maritime negligence rather than common law negligence."). "Absent a relevant statute, the general maritime law [is] developed by the judiciary." *East River*, 476 U.S. at 864. "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864–65; *see* 1 Schoenbaum, *supra*, § 4-1, at 220 ("The general maritime law is a body of concepts, principles and rules, originally customary and international in origin, that have been adopted and expounded over time by the federal courts."). In developing maritime law, "courts sitting in admiralty may draw guidance from, *inter alia,* the extensive body of state law . . . and from treatises and

22

other scholarly sources." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996). In particular, maritime courts have regularly looked to the current Restatement of Torts for guidance. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 (9th Cir. 2011) (following Restatement (Third) of Torts: Products Liability (1998)); *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1190 n.18 (11th Cir. 2009) (same); *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000) (same); *All Alaskan Seafoods, Inc. v. Raychem Corp.*, 197 F.3d 992, 995 (9th Cir. 1999) (same); *Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329, at \*16–17 (S.D. Fla. Aug. 23, 2011) (following Restatement (Third) of Torts: Physical and Emotional Harm (2010)).

## A. General Tort Principles

The district court found that Aramark "had a duty to be advised of the current weather forecasts and wind advisories before allowing any party to leave" and "breached its duty of reasonable care when it allowed the Prescott Party to leave the morning of April 25, 2009." Order at 14. The court found that because the forecast called for high winds and the boat's owner's manual stated that the boat was unsafe in winds exceeding 31 miles per hour, Aramark could have foreseen that the boat would sink, leading to the injury or death of its passengers. And because the accident was foreseeable, the court reasoned, Aramark had a duty to prevent the boaters from venturing onto Lake Powell. Aramark responds that it had no duty to be advised of and warn of weather conditions

23

and that to require concessionaires to close down whenever a danger is foreseeable would unduly impede access to national parks.

Before we determine what, if any, duty Aramark owed the boaters, we express our disagreement with the district court's methodology. Even if we accept that the accident was foreseeable, foreseeability does not equate to duty. In a maritime products-liability case, the Supreme Court expressly rejected the notion that a manufacturer's duty is coextensive with foreseeability: "In products-liability law, where there is a duty to the public generally, foreseeability is an inadequate brake. Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. . . . The law does not spread its protection so far." *East River*, 476 U.S. at 874 (citations omitted) (internal quotation marks omitted).

Instead, in a negligence case, such as the one before us, the role of foreseeability should be in assessing whether a person acted with reasonable care—that is, without negligence, *see* Restatement (Third) of Torts: Physical and Emotional Harm (Restatement (Third)) § 3, at 29 ("A person acts negligently if the person does not exercise reasonable care under all the circumstances.")—*after* the court has determined that there is a duty. In his classic formulation Judge Learned Hand wrote that whether a person is negligent "is a function of three variables: (1) The probability [of injury]; (2) the gravity of the resulting injury, if [it occurs]; (3) the burden of adequate precautions." *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). To exercise reasonable care one must take a precaution if the cost of doing so is less than the

24

probability of injury times the magnitude of the potential injury. *See id.* The Restatement (Third) has refined this formula: "To establish the actor's negligence, it is not enough that there be a likelihood of harm; the likelihood must be *foreseeable* to the actor at the time of conduct." Restatement (Third) § 3 cmt. g, at 33 (emphasis added). Thus, the Restatement states: "Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the *foreseeable* likelihood that the person's conduct will result in harm, the *foreseeable* severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm." *Id.* § 3, at 29 (emphasis added). Under the Restatement, lack of foreseeability can still be a basis for judgment in favor of the defendant. But it "is not a no-duty determination. Rather, it is a determination that no reasonable person could find that the defendant has breached the duty of reasonable care." *Id.* § 7 cmt. j, at 83.

Of course, it makes no practical difference whether we say that a defense judgment based on nonforeseeability is a no-duty determination or a no-breach determination. But when the potential for injury *is* foreseeable, it can make a decisive difference whether or not the court equates duty and foreseeability. The district court, not without some support in caselaw, ruled that Aramark had a duty simply because the danger was foreseeable. We think the better view, however, is that the determination of duty is a policy matter, not based on the foreseeability of danger in the particular case. The Restatement (Third) reflects this approach in the black letter of § 7:

> (a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.

25

(b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

*Id.* at 77. That is, "in some categories of cases, reasons of principle or policy dictate that liability should not be imposed. In these cases, courts use the rubric of duty to apply general categorical rules withholding liability." *Id.* cmt. a, at 77.

Such limitations on duty are widely accepted for a variety of reasons. One reason is "general social norms of responsibility." *Id.* cmt. c, at 79. As an example, the Restatement notes:

> [M]any courts have held that commercial establishments that serve alcoholic beverages have a duty to use reasonable care to avoid injury to others who might be injured by an intoxicated customer, but that social hosts do not have a similar duty to those who might be injured by their guests. Courts often justify this distinction by referring to commonly held social norms about responsibility.

*Id.* Similarly, the joy and benefits of sports, and respect for individual autonomy, have caused courts to limit liability for injuries in athletic competition. *See id.* at 78. Sometimes factors that go beyond the specific case may cause courts to adopt a no-duty rule even when "reasonable minds could differ about the application of the negligence standard to a particular category of recurring facts." *Id.* cmt. i, at 81. "In conducting its analysis, the court may take into account factors that might escape the jury's attention in a particular case, such as the overall social impact of imposing a significant precautionary obligation on a class of actors. These cases are properly decided as duty or no-duty cases." *Id.* For example, courts have held that because treating physicians are in the best position to inform patients of the risks and benefits of prescription drugs, drug

26

manufacturers must provide warnings to physicians but ordinarily have no duty to warn individual patients. *See id.* cmt. i, at 82. In sum:

> A no-duty ruling represents a determination, a purely legal question, that no liability should be imposed on actors in a category of cases. Such a ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care. These reasons of policy and principle do not depend on the foreseeability of harm based on the specific facts of a case. They should be articulated directly without obscuring references to foreseeability.

*Id.* cmt. j, at 82.

For the sake of completeness, we note that two additional conditions must be met to establish liability even if it has been determined that the defendant had a duty and breached the standard of care. First, the defendant's action must have factually caused the harm, meaning "the harm would not have occurred absent the conduct." *Id.* § 26, at 346. Second, the injury must have "result[ed] from the risks that made the actor's conduct tortious." *Id.* § 29, at 493. The confusing term *proximate cause* is sometimes used to describe this second condition, *see id.* cmt. b, at 494, but the better term is *scope of liability*. The central idea is that "an actor should be held liable only for harm that was among the potential harms—the risks—that made the actor's conduct tortious." *Id.* cmt. d, at 495–96. For example, a man who hands a loaded gun to a child negligently creates the risk that the child will shoot someone; if the child drops the gun on her toe, breaking it, the man is not liable because dropping the gun onto the foot is not within the scope of risks that rendered the man's action negligent. *See id.* illus. 3, at 496–97.

27

**B. Aramark's Duty**

We now turn to Aramark's duty in this case. As we understand Claimants' argument, Aramark had a duty not to rent the boat because of the dangers apparent from the weather forecast and the limited capacity of the boat to withstand high winds. Implicit in this argument is the argument that Aramark had a duty to warn the boaters about the weather forecast and the boat's limited capacity. It is useful to discuss separately the alleged duties to warn of the weather and to warn of the boat's capacity because different considerations apply to each. We first address whether Aramark had a duty to warn of the weather; then whether Aramark had a duty not to rent the boat because of the weather; and then whether Aramark had a duty to warn of the boat's limited capacity.

In our view, Aramark had no duty to obtain a weather forecast and provide it to the boaters. As we noted above in the general discussion of duty, notions of personal responsibility regularly underlie no-duty determinations. The question here is whether the defendant must protect the plaintiff against a danger not created by the defendant when the plaintiff could take the same protective steps at least equally easily and well. The rented boat was equipped with a radio for obtaining weather reports. The boaters could obtain the forecast with the same minimal effort that the Aramark representative at the marina could. Also, forecasts are notoriously iffy. The forecasts available on the boat radio during the trip would be more timely than the forecast that could be provided by the representative before the trip began. With all this in mind, it is unsurprising that

28

every reported decision (cited to or found by us) to consider the point has held that there is no duty to acquire a weather forecast and provide it to customers.

Of particular note is *Leach v. Mountain Lake*, 120 F.3d 871, 872–73 (8th Cir. 1997), also involving a fatal boating accident after the renting marina neither obtained weather information nor passed it on to its customers. *See id.* at 872. As here, the weather was calm when the boat was rented, but the NWS had issued an advisory warning of strong afternoon gusts. The Eighth Circuit held that as a matter of law "the marina had no . . . duty to acquire and pass on weather information," affirming the district court's reasoning "that weather information is readily available to those who rent boats (should they choose to seek it), that boaters can themselves observe weather and sea changes and ascertain water temperature, and that the ability of boaters to do this is not in any way dependent upon what marinas do or do not tell them." *Id.* at 873; *see also, e.g.*, *Grant v. Wakeda Campground, LLC*, 631 F. Supp. 2d 120, 128 (D.N.H. 2009) ("Both the inherent unreliability of weather forecasts and the fact that weather changes constantly justify not imposing on defendant a greater duty to monitor the weather than can be expected of plaintiffs. . . . [T]here is no basis to impose a duty to monitor the weather as part of the duty to keep the [campground] safe."); *Petition of Binstock*, 213 F. Supp. 909, 915 (S.D.N.Y. 1963) (prospective boat purchaser died in a storm while testing the boat; the court ruled that the seller had no duty to warn of weather conditions when "such perils as may have existed were equally apparent to and cognizable by [purchaser and seller]"); *West v. City of St. Paul*, 936 P.2d 136, 139 (Alaska 1997) ("Because most

29

weather conditions are open and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers."); *cf. Black v. United States*, 441 F.2d 741, 744 (5th Cir. 1971) (ruling in a plane-crash case that any negligence of flight controller was superseded by pilot's negligence because "[i]t was the pilot's responsibility to obtain a weather briefing" and the pilot could have obtained weather updates "merely by monitoring the stations along his route"); *Croce v. Hall*, 657 A.2d 307, 312 (D.C. 1995) (landlord had no duty to monitor weather reports so that he could be prepared to immediately clear sidewalk of snow; "weather predictions are often wrong").

Similar considerations undoubtedly underlie, at least in part, limitations on liability for negligent failure to warn set forth in § 18 of the Restatement (Third). The black letter states:

> (a) A defendant whose conduct creates a risk of physical or emotional harm can fail to exercise reasonable care by failing to warn of the danger if:
> > (1) the defendant knows or has reason to know: (a) of that risk; and
> > *(b) that those encountering the risk will be unaware of it; and*
> > *(2) a warning might be effective in reducing the risk of harm.*

Restatement (Third) § 18 (emphasis added); *see* Scope Note to §§ 17–19 at 183 ("To some extent these rules . . . involve matters with public-policy significance that courts have deemed to be duty issues under § 7, to be decided by courts rather than by juries."). Thus, under § 18 a defendant is not liable for failing to warn of a danger to another person when the defendant would expect the other person to be aware of the danger or if the warning would not be effective in reducing the risk, even if the defendant created the

30

risk. Here, the defendant did not create the danger and had no greater capacity to learn of the danger than the injured persons did, particularly when one considers the advisability of getting periodic updates of the forecast. We conclude that Aramark had no duty to monitor the weather and provide a forecast to the boaters.[4]

It would be even more problematic to impose upon Aramark a duty to shut down boat rentals based on the forecasts it receives. If Aramark has no duty to customers to monitor and report the weather forecast, we see no basis for requiring it to monitor the weather and then make the decision for customers about whether it is advisable to venture onto the lake. *See Grant*, 631 F. Supp. 2d at 129 (no duty to close campground). Such decisions are sometimes made by governmental authorities (for example, the NPS could close Lake Powell to boating, although it did not restrict access on the day of the accident). *But see Johnson v. U.S., Dep't of Interior*, 949 F.2d 332, 337 (10th Cir. 1991)

---

[4] Claimants suggest that Aramark "assumed the responsibility of providing weather information to [the boaters] yet failed to provide accurate and up-to-date such information." Aplee. Br. at 43; *see id.* at 37 ("Aramark exacerbated the situation by telling [the boaters] that they would receive an updated forecast and the rental prospects would be reevaluated the following morning, but then failed to do so."); *id.* at 35 ("Aramark . . . undertook the responsibility of providing weather forecast information to [the boaters]."). A duty may arise where a party voluntarily undertakes to warn others of weather conditions, and those others rely on that party for those warnings. *See* Restatement (Second) of Torts § 323 (1965); *Sall v. T's, Inc.*, 136 P.3d 471, 473–74, 484 (Kan. 2006) (golf course assumed the duty to use a horn to warn its patrons of dangerous thunderstorms, which lightning-strike victim relied on to his detriment). We question whether Claimants adequately raised on appeal an assumed-undertaking theory of duty. But in any event they failed to raise an assumed-duty theory below, as illustrated by the district court's discussion of duty, which contains no reference to an assumed undertaking. (That was a reasonable course for Claimants because it would be hard for them to prove reliance when the boaters never requested the weather information on the day they took the boat.) The issue was therefore forfeited. *See Tele-Communications, Inc. v. C.I.R.*, 104 F.3d 1229, 1232 (10th Cir. 1997).

(although rock climbers in Grand Teton National Park are required to obtain a permit, park rangers have no authority to stop them from attempting dangerous climbs). Claimants, however, have pointed us to no comparable duties under tort law. Imposing a duty that so limits personal choice in the context of recreation would be particularly inappropriate. We have already noted that the duty of ordinary care—imposed on those who created the danger—has generally been relaxed in the context of athletic competition. Similarly, nearly every state has encouraged landowners to freely open their property for outdoor recreation by relaxing the traditional standard of care for landowners to keep their property safe. *See Klepper v. City of Milford, Kansas*, 825 F.2d 1440, 1444 (10th Cir. 1987). "[T]hese statutes promote casual recreational use of open space by relieving landowners of the concern that they will be sued for injuries to strangers who hunt, trek, fish, and otherwise recreate on their land or water free of charge." *Id.* Absent such statutes, landowners would "simply close their lands to public use and many recreational opportunities thereby would be lost to the public." *Id.* Requiring marinas to stop renting boats because of forecasted bad weather would without doubt unnecessarily limit opportunities for adventure that many seek. *See* Aplt. App. at 99–100 (Trial Tr.) (according to Aramark's agent, although she suggested to the rental party that rather than renting their own boat they book passage on a "warm" and "comfortable" tour boat piloted by Aramark, they declined because "they wanted the adventure. They wanted to go by themselves rather than a tour boat group of people." *Id.*). The weather may turn out to be calm, or the boaters may take precautions that minimize risk. We therefore

32

reject Claimants' contention that Aramark could be liable for negligence in allowing the boaters to rent the boat.

We need not decide whether a marina could be liable for gross negligence or recklessness in renting a boat during inclement weather. The evidence of record here, particularly the fact that the forecasted bad weather was not supposed to arrive for several hours, would not support such a claim.

Our discussion thus far has addressed only the claims of duty that depend on information regarding the weather. We have assumed that the boating party was fully informed in all other respects. But Claimants have not contended that the weather in itself was the sole source of risk when the boat was rented. They claim that what made the forecasted weather particularly dangerous was that the boat was not designed for such weather conditions. As we stated above, we think that implicit in their claim is the contention that Aramark had a duty to warn the boaters of this design limitation. Such a duty to warn is quite different from a duty to warn about the weather when the boaters had at least as good access to information as Aramark. We can think of no reason of policy or principle to excuse Aramark from negligence for failure to warn a renter of a boat's limitations. Therefore, Restatement (Third) § 7(a) applies and Aramark had a duty to exercise reasonable care. But we express no view on whether Aramark failed to exercise such care. Because the relevant facts have not been resolved by the district court, we must remand for further proceedings on the issue.

Finally, we consider Aramark's contention that even if it had been negligent, the boaters' own negligence was the superseding cause of the accident. The alleged acts of superseding negligence are failure to obtain a weather forecast before departing or to monitor weather updates during the journey; failure to wear life vests; failure to monitor deteriorating conditions or to take action to safeguard against them; and declining to seek safe harbor, including declining an offer to stay at Dangling Rope. We cannot say as a matter of law that these were superseding causes. The contention that the boaters failed to monitor or safeguard against worsening conditions is factually disputed, as is the availability of a safe harbor and the nature of the conversation at Dangling Rope. In any event, Aramark's claimed negligence was its failure to warn of the boat's wind limitation, and we decline to declare as a matter of law that the boaters would have acted the same if they had been so warned.

## IV.   CONCLUSION

We VACATE the judgment below and REMAND to the district court for further proceedings to determine whether Aramark negligently failed to warn the boaters of the information contained in the Baja owner's manual.